**ST. AGNES HOSPITAL OF THE CITY
OF BALTIMORE, INC.,**

v.

**Frank A. RIDDICK, Jr., M.D., etc.**

Civ. No. HM–86–3071.

United States District Court,
D. Maryland.

Sept. 10, 1990.

John G. Kruchko, Jay R. Fries and Kathleen A. Talty, Towson, Md., for plaintiff.

Philip Jacobs and John F. King, Baltimore, Md., Douglas R. Carlson, Gary E. Dyal, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

### MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Plaintiff, St. Agnes Hospital of the City of Baltimore, Inc. ("St. Agnes" or "Hospital"), brought this action against defendant Frank A. Riddick, Jr., M.D., as Chairman of the Accreditation Council for Graduate Medical Education ("ACGME"). St. Agnes is a Roman Catholic health care institution and, as such, it adheres to the ethical and moral teachings of the Roman Catholic Church. In June of 1986, the ACGME withdrew accreditation of St. Agnes' residency training program in obstetrics and gynecology, citing deficiencies in the program relating to retropubic surgery, tubal surgery, family planning and education in the subspecialties of oncology and endocrinology. Plaintiff primarily alleges that the ACGME discriminated against and penalized St. Agnes because of its religious philosophies, specifically, its refusal to perform and to provide clinical training in elective abortions, sterilizations and artificial contraception.

In this action, the Hospital alleges violations of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1985(3), common law due process rights and breach of contract, and § 20–214 of the Maryland Health General Code. Plaintiff seeks injunctive relief, preventing withdrawal of accreditation, as well as declaratory relief, requiring the defendant to protect plaintiff's religious and due process rights during any future accreditation reviews.

This Court held a bench trial in December of 1988 and heard final arguments on July 21, 1989. The Court has carefully reviewed the evidence and testimony presented, as well as the post-trial briefs submitted by counsel. It is now prepared to rule.

## I. BACKGROUND

The Plaintiff is a health care and teaching hospital that offers several medical residency training programs for graduates of medical schools, including a program in obstetrics-gynecology. A residency program is graduate medical education which follows the undergraduate period of medical education. After receiving the M.D.

degree, physicians enroll in graduate medical education to develop expertise in some special branch of medicine.[1] In addition to attaining the knowledge and skills needed to be practitioners, during the graduate phase of their education, most residents seek to complete training requirements for certification by a specialty board. Each board generally requires that graduate medical education be obtained in a program reviewed and approved by the Residency Review Committee ("RRC") for that specialty, under the authority of the ACGME. In order to maintain its residency programs, each program must be accredited by the defendant ACGME. Accreditation is the process through which the ACGMe assures medical students, residents, specialty boards, and the public that residency programs meet established educational standards for graduate programs in the various medical specialties.

The ACGME is a non-profit, private association sponsored by five national organizations: the American Board of Medical Specialties, the American Hospital Association, the American Medical Association, the Association of American Medical Colleges and the Council of Medical Specialty Societies. Each sponsoring organization appoints four representatives to the twenty-three member Council. The other members are a resident representative, a public member, and a non-voting representative of the federal government. In order to accomplish the review and evaluation of residency programs, the ACGME has organized RRC's for each medical specialty. The RRC for Obstetrics–Gynecology is composed of twelve unpaid volunteers appointed by the American Board of Obstetrics and Gynecology, the American Medical Association Council on Medical Education, and the American College of Obstetricians and Gynecologists. The Executive Director of the American Board of Obstetrics and Gynecology and a staff person for the American College of Obstetricians and Gynecologists

also serve on the RRC in an ex officio capacity.

The RRC is responsible for reviewing and evaluating all residency programs within its area of specialty pursuant to the Manual of Structure and Functions. The standards for accreditation of obstetrics-gynecology residency programs consist of the "General Requirements," which are applicable to residency programs in every specialty, and the "Special Requirements for Residency Training in Obstetrics–Gynecology" ("Special Requirements"). The Special Requirements state that the program must offer training in high-risk obstetrics, immediate care of the newborn, the full range of gynecologic surgery, gynecologic oncology including the use of radioactive materials, gynecologic surgical pathology, reproductive endocrinology and infertility, family planning, emergency medicine, psychosexual and psychosomatic counseling, genetics, medical jurisprudence, and the full range of commonly accepted diagnostic procedures.

The evaluation process consists of the submission by the residency program director of a lengthy and detailed report. In addition, an on-site inspection is made by a surveyor designated by the RRC, in order to verify the information provided. The surveyor collects data and information on the program and submits a report to the RRC. The material is reviewed by the RRC, which then recommends full accreditation, probation or withdrawal of accreditation.

Once the RRC makes its preliminary determination, a program found to be deficient may request reconsideration by the RRC and submit further information in an attempt to establish that it is not deficient. If the RRC sustains its prior determination, the program director may request a hearing before a board of appeals, consisting of three directors of accredited residency programs in obstetrics-gynecology. The program chooses one panelist, the RRC choos-

1. During the graduate phase, the knowledge and skills acquired in medical school are expanded through the progressive assumption of personal responsibility for patient care in supervised, clinical, educational environments ... As residents progressively gain more knowledge and skill they are provided greater latitude to make decisions and treat patients, but always under supervision.
[Plaintiff's Ex. 4 at 2].

es one and they in turn select the third. The Board of Appeals reviews all of the submitted material, and conducts a hearing at which the program, represented by counsel, may submit further evidence, including witnesses, in order to establish that it is in substantial compliance with the general and special requirements. The decision of the Board of Appeals is then submitted to the ACGME for a final determination as to the status of the program.

St. Agnes, a Roman Catholic hospital sponsored by the Daughters of Charity of St. Vincent de Paul, adheres to the ethical and moral principles of the Roman Catholic Church, which are set forth in the "Ethical and Religious Directives for Catholic Health Facilities" ("Directives").[2] The Directives proscribe elective prevention of conception and elective termination of pregnancy.[3] Sister Mary Louise Lyons, President of St. Agnes and Chairman of the Board of Directors, testified that "the effect [of the Directives] is just to simply clarify what St. Agnes Hospital has always held, that is its basic religious beliefs." [Tr. 81].

In view of the Hospital's Catholic sponsorship and adherence to the tenets of the Catholic Directives, St. Agnes does not provide residents in the obstetrics-gynecology program with clinical training in procedures which are directly intended to prevent conception or are directly intended to terminate the life of a fetus. Furthermore, St. Agnes follows the doctrine of "material cooperation,"[4] which Sister Lyons interpreted as "... what the residents do, we participate in materially." [Tr. 85]. Extending that principle, St. Agnes forbids its residents from indirectly acquiring clinical experience that cannot be directly obtained within the hospital. Thus, St. Agnes does not allow its residents to acquire clinical experience in sterilization, abortion, or artificial contraception in a rotation outside of the hospital.[5] Plaintiff believes that allow-

---

**2.** The preamble to the Directives provides:

Catholic health facilities witness to the saving presence of Christ and His Church in a variety of ways: by testifying to transcendent spiritual beliefs concerning life, suffering, and death; by humble service to humanity and especially to the poor; by medical competence and leadership; and by fidelity to the Church's teachings while ministering to the good of the whole person ...

The Catholic sponsored health facility and the board of trustees, acting through its chief executive officer, further, carry an overriding responsibility in conscience to prohibit those procedures which are morally and spiritually harmful. The basic norms delineating this moral responsibility are listed in these Ethical and Religious Directives for Catholic Health Facilities. It should be understood that patients and those who accept board membership, staff appointment or privileges, or employment in a Catholic health facility will respect and agree to abide by its policies and these Directives. Any attempt to use a Catholic facility for procedures contrary to these norms would indeed compromise the board and administration in its responsibility to seek and protect the total good of its patients, under the guidance of the Church.

These Directives prohibit those procedures which, according to present knowledge, are recognized as clearly wrong.

[Plaintiff's Ex. 252].

**3.** Specifically, the Directives state: "From the moment of conception, life must be guarded with the greatest care. Any deliberate medical procedure, the *purpose* of which is to deprive a fetus or an embryo of its life, is immoral." [Plaintiff's Ex. 252]. The Directives proscribe abortion for the purpose of terminating life and proscribe sterilization for the purpose of preventing conception. The Directives prohibit "every action which, either in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible." [Plaintiff's Ex. 252]. The Directives do, however, permit performance of a sterilization or abortion procedure to prevent a pathological disease from spreading.

**4.** The Directives state:

Abortion, that is, the directly intended termination of pregnancy before its viability, is never permitted nor is the directly intended destruction of a viable fetus. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic hospitals are not to provide abortion services based upon the principle of *material cooperation*.

[Tr. 84; Plaintiff's Ex. 252] (emphasis added).

**5.** Several witnesses and counsel have used the term "family planning" to encompass abortion, sterilization and artificial contraception. Therefore, the Court may use the terms interchangeably as a shorthand throughout this Memorandum.

ing its residents to have outside clinical training in the forbidden procedures, while they are under contract and being paid by St. Agnes, would amount to material cooperation in those procedures.

Prior to commencing a residency in obstetrics-gynecology at St. Agnes, each resident is advised of the hospital's religious beliefs and agrees to abide by them during the residency period. Specifically, before beginning the residency, each resident receives a residency agreement as well as a letter from the president of St. Agnes. The agreement provides:

> Acceptance of this appointment indicates agreement to comply with the rules and regulations of the hospital and of the department of [obstetrics-gynecology] and its teaching as well as the philosophical and ethical directives and policies upheld and practiced by the Hospital.

[Plaintiff's Ex. 255]. The letter expresses the hospital's moral and religious beliefs and makes clear that its training does not include "the actual clinical experience in contraception, sterilization and abortion or pregnancy termination," although it does include didactic instruction. [Tr. 76, 77; Plaintiff's Ex. 255].[6] It also provides that outside electives in artificial contraception, sterilization and pregnancy termination will not be permitted while the resident is under contract with St. Agnes.[7]

St. Agnes' graduate residency program in obstetrics-gynecology was fully accredited until 1981. In October of 1981, the RRC for Obstetrics–Gynecology placed the program on probation because of three stated deficiencies: inadequate supervision of the residents, inadequate total responsibility for a sufficient number of patients, and an inadequate number of faculty.

In 1983, the program was resurveyed by the RRC and probationary status was continued. The RRC found inadequacies in the following areas of resident education:

a. The resident experience in vaginal surgery;

b. The volume of obstetrical cases available;

c. The resident experience in oncology;

d. The resident experience in the immediate care of the newborn;

e. The lack of experience in genetics;

f. The lack of clearly stated educational objectives in the program;

g. The resident experience in family planning;

h. The need for improvement in the area of research.

[Plaintiff's Ex. 31].

In October of 1984, the program was resurveyed. In April of 1985, the RRC held a meeting at which it evaluated the survey material and found that the residency program was deficient in the following areas:

a. The resident experience with vaginal surgery is deficient;

b. The resident experience with abdominal hysterectomy is uneven and deficient;

c. The resident experience in retropubic surgery is both deficient and uneven;

d. There is little experience with tubal surgery;

e. The experience with brachytherapy is by observation only;

f. The experience in laparoscopy is inadequate;

g. The obstetrical experience is inadequate, both with normal deliveries and with complicated deliveries;

h. The resident experience with family planning is inadequate;

---

**6.** According to testimony, the didactic program includes lectures given by residents, faculty, and outside representatives on artificial contraception, sterilizations, and abortions. [Tr. 544].

**7.** Sister Lyons testified that this provision "means that when residents go to the university hospital, whichever hospital we are affiliated with at the time—right now it is the University of Maryland and has been for a number of years—they do not perform any of these procedures while there." [Tr. 79]. Further, St. Agnes has an understanding with the University of Maryland that the University will not provide clinical training in the proscribed procedures to St. Agnes residents on rotation there. [Tr. 100].

i. The continuity of education in the subspecialties is inadequate. The extramural rotations for oncology and endocrinology do not provide a good *ongoing* experience in these areas. The parent institution is unable to provide an overall adequate experience.

The RRC determined that it would withdraw accreditation effective June 30, 1986. [Plaintiff's Ex. 14]. On April 30, 1985, the RRC notified St. Agnes of its decision.

In May of 1985, St. Agnes sought reconsideration of the withdrawal.[8] On reconsideration, the ACGME rescinded four of the stated deficiencies but found that the program provided inadequate experience in retropubic surgery, tubal surgery, brachytherapy, family planning, and in the subspecialties of oncology and endocrinology. [Plaintiff's Ex. 13]. It affirmed the decision to withdraw the program's accreditation effective June 30, 1987, and detailed its findings of deficiencies.

St. Agnes appealed the decision and a hearing was held before the Board of Appeals on April 14, 1986. St. Agnes was represented by counsel at the hearing and submitted an extensive brief in addition to the earlier submitted data. The Hospital had an opportunity to make an oral presentation, to offer testimony, and to request testimony from those involved in the evaluation of the program. The Board of Appeals unanimously upheld its previous decision with respect to four of the program's deficiencies, rescinding the deficiency in brachytherapy. In June of 1986, the ACGME adopted the recommendation of the Board of Appeals to withdraw the program's accreditation.

Following the ACGME'S final decision, the plaintiff initiated the instant action.

## II. FREE EXERCISE OF RELIGION

■ In order to establish a violation of the free exercise clause of the first amendment, as applied to the states through the fourteenth amendment, a plaintiff must es-tablish that the defendant was a state actor and that the challenged conduct resulted in impairment of the plaintiff's free exercise of genuinely held beliefs. *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). St. Agnes argues that the evidence at trial shows that the ACGME maintains a policy requiring all obstetrics-gynecology residency programs to provide clinical training in abortion, sterilization and artificial contraception. Because of St. Agnes' religious beliefs, St. Agnes refuses to provide such training, either within the Hospital or during a sponsored rotation outside of the Hospital. Hence, the plaintiff contends that the ACGME's standards infringe upon St. Agnes' right to free exercise of its religious beliefs.

In a Memorandum and Order issued on August 31, 1987, this Court ruled that the defendant ACGME is a state actor in the context of this case. *St. Agnes Hospital v. Riddick*, 668 F.Supp. 478, 479–482 (D.Md. 1987). The Court held that the State of Maryland was responsible for licensing physicians, established a requirement in the Maryland statute that applicants be trained in a residency program accredited by the ACGME or its equivalent, and delegated its accreditation authority to the ACGME, compelling residency programs to seek accreditation from the defendant. Thus, the Court found that the State of Maryland had delegated an exclusive state function to the ACGME. The defendant, in a footnote to its post-trial brief, asks the Court to reconsider its ruling in light of two recent cases: *National Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), and *Zavaletta v. American Bar Ass'n.*, Civil Action No. 89–326–N, transcript of proceedings (E.D.Va. May 5, 1989) (bench opin-

---

**8.** On August 19, 1985, St. Agnes submitted written materials and information in support of continued accreditation of the program.

ion). 721 F.Supp. 96 (E.D.Va.1989) (supplementing bench opinion).

In *Tarkanian,* the Supreme Court held that a state university's imposition of disciplinary sanctions against a basketball coach in compliance with National Collegiate Athletic Association ("NCAA") rules and recommendations did not turn the NCAA's otherwise private conduct into state action. *Tarkanian,* 488 U.S. 179, 109 S.Ct. 454. The NCAA, an unincorporated association consisting of approximately 960 public and private universities and colleges, adopts rules governing member institutions' recruiting, admissions, academic eligibility, and financial aid standards for student athletes. *Id.,* 109 S.Ct. at 455. The NCAA's Committee on Infractions conducts investigations, makes factual determinations, and is expressly authorized to impose penalties upon members that have violated the rules, but is not authorized to sanction a member institution's employees directly. *Id.* After an investigation of allegedly improper recruiting practices by the University of Nevada, Las Vegas ("UNLV"), a state university, the Committee found several violations, including a number of violations by Jerry Tarkanian, UNLV's basketball coach. The Committee imposed sanctions, and requested it to show cause why additional penalties should not be imposed if it failed to suspend Tarkanian from its athletic program during a probationary period. Although UNLV believed that the NCAA was wrong, it notified Tarkanian that he would be suspended during the term of the team's NCAA suspension. Tarkanian brought suit, alleging that he had been deprived of his fourteenth amendment due process rights in violation of 42 U.S.C. § 1983. The Nevada Supreme Court affirmed the district court's determination that the NCAA's conduct constituted state action.

The Supreme Court reversed, holding that the NCAA's participation in the events that led to Tarkanian's suspension did not constitute "state action." The Court found that, although UNLV, a state actor, had some minor impact on the NCAA's policy determinations, the source of the NCAA rules is the collective membership, rather than the state. *Id.,* 109 S.Ct. at 461–463. Specifically, the Court stated:

> Neither UNLV's decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance.

*Id.*

Furthermore, UNLV's decision to adopt the NCAA's rules did not transform them into state rules and the NCAA into a state actor, since UNLV retained plenary power to withdraw from the NCAA and to establish its own standards. *Id.* The Court reasoned that the NCAA's actions did not constitute state action on the theory that they resulted from a delegation of power by UNLV because UNLV delegated no power to the NCAA to take specific action against any University employee, UNLV and the NCAA acted as adversaries throughout the proceedings, the NCAA enjoyed no governmental powers to facilitate its investigation; and the NCAA did not and could not directly discipline Tarkanian, but could only threaten additional sanctions against the UNLV. *Id.,* 109 S.Ct. at 463–465.

In *Zavaletta,* third year law students at CBN University School of Law filed suit against the American Bar Association ("ABA"), challenging the ABA's actions in connection with the accreditation of its law school. In an oral opinion that was delivered after expedited consideration, the court denied plaintiffs' motion for a preliminary injunction and granted defendant's motion for summary judgment, dismissing the suit. In doing so, the court found that it did not have jurisdiction because defendant's conduct did not constitute state action. Its discussion of the issue, however, was quite limited due to time constraints. The court stated only that it was following the Supreme Court's holding in *Tarkanian.*

> I feel that it [*Tarkanian*] really resolves this matter because I find that on the existing law, and under the statement of principles laid down in *Tarkanian* by the

Supreme Court of the United States, that state action is not present in this case, and that this Court has no jurisdiction. But in order to make sure that the record is as complete as possible so that in the event of an appeal the Fourth Circuit will have all my views on this case, because they may disagree with me about the state action question, I'm going to review the rest of the case and state whether or not I would have found for the Plaintiffs or the Defendants in the event that I had found that the Court did have jurisdiction.

*Zavaletta v. American Bar Ass'n*, Civil Action No. 89–326–N, transcript of proceedings (E.D.Va. May 5, 1989) (bench opinion).

Although the ruling in *Zavaletta* may well be relevant to the state action issue in this case, that court's discussion of state action is of little value because of its brevity. Although the case was appealed, it is this Court's understanding that pending in the Fourth Circuit is a joint motion to dismiss. Consequently, the holding in *Zavaletta* is of little significance for this Court's purposes.

Regardless, this Court finds that the Supreme Court's conclusion in *Tarkanian* does put into doubt this Court's 1987 finding of state action on the part of the ACGME. The circumstances of *Tarkanian*, however, are certainly distinguishable from the facts *sub judice*. Most importantly, the final act that caused the alleged harm to Tarkanian was committed by a party conceded to be a state actor, while in this case, a private party, the ACGME, has taken the decisive step. The Court in *Tarkanian* emphasized that the NCAA was not authorized to directly discipline Tarkanian or any other state employee. In *St. Agnes*, the ACGME had the authority and did in fact make the final determination to withdraw plaintiff's accreditation. Consequently, *Tarkanian* is not analogous to the situation at hand.

Furthermore, neither the Supreme Court nor any federal court has directly addressed the issue of state action in relation to state medical accreditation committees.

Comparable cases, however, indicate that the ACGME's actions in this case do not amount to the requisite state action. *See, e.g., Johnson v. Educational Testing Serv.*, 754 F.2d 20, 23–25 (1st Cir.1985) *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985) (because defendant's formulation, grading and reporting of standardized test is not exclusive public function, and in light of failure to prove that public institutions belonging to testing service administering law school admission tests took lead in instigating challenged conduct, defendant testing service was not state actor); *Dietz v. American Dental Ass'n*, 479 F.Supp. 554, 556 (E.D.Mich. 1979) (American Dental Association's procedure for admission to professional society is not state action); *Interfaith Medical Center v. Sabiston*, 133 Misc.2d 308, 507 N.Y.S.2d 124 (Sup.Ct.1986) (in suit against ACGME for withdrawing accreditation from medical center's surgical residency program, state supreme court stated in dicta that it would "refrain from viewing plaintiff's complaint under the doctrine of 'State Action' nor expand the doctrine to embrace the allegations of plaintiff's complaint.")

Neither the ACGME nor St. Agnes has engaged in a detailed debate on the state action issue, mentioning it only in one brief footnote apiece. In view of the fact that counsel have not briefed the issue in depth, because the Court has already heard extensive evidence on the substantive claims in this case, and in light of the Court's ultimate findings in favor of the ACGME on all counts, the Court will address in this Memorandum those claims that require state action as well as those that do not.

Although counsel, in their briefs, seem to pursue rather different avenues of legal analysis regarding the free exercise claim, they do agree that this is a case primarily involving "indirect compulsion," that is, a claim that the state action required the plaintiff to choose between the exercise of its religion and the receipt of a governmental benefit. *See, e.g., Hobbie*, 480 U.S. 136, 107 S.Ct. 1046; *Thomas*, 450 U.S. 707, 101 S.Ct. 1425; *Sherbert v. Verner*, 374 U.S.

398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Court in *Thomas* stated:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas*, 450 U.S. at 717–718, 101 S.Ct. at 1432. However, once a party establishes that its religious practice is burdened by a governmental requirement, that does not mean that an exemption accommodating its practice must be granted. *Id.* at 718, 101 S.Ct. at 1432.

> The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest. However, it is still true that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder,* ... [406 U.S. 205] at 215 [92 S.Ct. 1526, at 1533, 32 L.Ed.2d 15 (1972)].

*Id.*

■ In this case, plaintiff argues that defendant should exempt St. Agnes from its requirement that all obstetrics-gynecology residency programs provide clinical training in family planning procedures. Under the free exercise clause, a claimant may seek exemption from a governmental requirement by showing a sincerely held religious belief which conflicts with, and thus is burdened by, the state requirement. Once the claimant has made that showing, the defendant can prevail only by demonstrating that the requirement pursues an important governmental goal, and that an exemption would substantially hinder the fulfillment of the goal. The Court will now address each of these issues *seriatim.*

### A. Sincerely Held Religious Beliefs & Burden by the Requirement

■ The Court finds that the evidence fully supports St. Agnes' claim that the Hospital's religious beliefs are sincerely held and that its refusal to permit clinical training in elective abortion, elective sterilization and artificial contraception is consistent with those beliefs. Furthermore, the Court finds that St. Agnes' interpretation of the doctrine of material cooperation as forbidding its residents from getting clinical training during a rotation outside the Hospital is not inconsistent with the Catholic Directives and St. Agnes' sincerely held religious beliefs. Although there was evidence at trial that some Catholic hospitals allow their residents to get clinical experience in the proscribed procedures during an outside rotation the Court cannot say that St. Agnes' interpretation, simply because it is stricter than that of some other Catholic hospitals, does not amount to a sincerely held religious belief. *See Thomas*, 450 U.S. at 715–716, 101 S.Ct. at 1431 (holding that guarantee of free exercise is not limited to beliefs which are shared by all members of a religious sect).[9]

9. *Thomas* involved the State's denial of unemployment compensation benefits to the petitioner, a Jehovah's Witness who terminated his job because his religious beliefs forbade participation in the production of armaments. In analyzing whether the denial of benefits constituted a violation of the petitioner's First Amendment right to the free exercise of religion, the Supreme Court discussed an issue similar to the one here, stating:

> The Indiana Court also appears to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was "scripturally" acceptable. Intrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here, and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow

The Court finds it unnecessary, indeed, objectionable, to delve any further into the sincerity with which plaintiff's religious views are held. Suffice it to say that plaintiff has clearly met its burden on this point.

St. Agnes must also prove that its sincerely held religious beliefs conflict with, and thus are burdened by, the ACGME's requirement. Although there was some ambiguity in the testimony, the Court finds that the ACGME requires all obstetrics-gynecology residency programs to provide clinical experience in family planning and that adequate training in family planning requires experience in clinical aspects of artificial contraception, sterilization and abortion. The defendant requires that this clinical training be provided either within the hospital or through an outside rotation. The Hospital contends that the defendant's requirement that all obstetrics-gynecology residency training programs provide their residents with clinical training in abortion, sterilization and artificial contraception conflicts with St. Agnes' religious tenets. Plaintiff argues that in order to obtain the benefit of accreditation, it is being forced to reject its religious beliefs and proscriptions.

However, the evidence does not establish that St. Agnes' religious beliefs prohibited it from providing its residents with *any* clinical training in the procedures at issue. On the contrary, the Directives do permit performance of abortion and sterilization, and prescription of artificial contraceptives under certain circumstances, that is, for purposes other than prevention of procreation or termination of a pregnancy.[10] As a result, there are opportunities for St. Agnes residents to get clinical exposure in these areas.

Defendant thus argues that any conflict between its training requirement and the Catholic Directives is one of quantity and not quality. That is, the defendant contends that while a significant number of family planning procedures were performed at St. Agnes, the plaintiff failed to make use of those opportunities to offer training to its residents.[11] Thus, St. Agnes cannot complain that its religious Directives prohibit it from providing the requisite clinical training.

Defendant also relies on evidence introduced by plaintiff showing that Catholic affiliated programs are fully capable of complying with the essentials for accreditation, including the requirement of clinical experience in family planning. The evidence shows that at least forty-one Catholic affiliated hospitals have sponsored, and continue to sponsor, resident training programs in obstetrics-gynecology. [Tr. 606–630]. During the time period analyzed, thirty-six of the Catholic programs were never cited as deficient in family planning training. [Tr. 682; Plaintiff's Ex. 273]. Thus, other Catholic hospitals were able to maintain accreditation of their programs without sacrificing their religious beliefs. This evidence weighs heavily in favor of the defendant and against plaintiff's argument that the ACGME's requirement is in conflict with its Catholic beliefs.

Finally, the plaintiff's arguments regarding the alleged burden on its free exercise rights lose much of their persuasiveness when assessed in the context of this case. It is critical to keep in mind that accreditation was withdrawn from the St. Agnes

---

worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.
*Thomas,* 450 U.S. at 715–716, 101 S.Ct. at 1430–1431.

**10.** For example, residents at St. Agnes receive clinical exposure to sterilization during surgery, both abdominal and laparoscopic, when the sterilization procedure is demonstrated but not completed. [Tr. 544–545]. The residents also acquire experience in using suction curettage on patients with misabortions or incomplete abortions that were performed elsewhere. In addi-

tion, clinical experience in family planning includes diagnosing the causes of and treating infertility, an aspect that is not prohibited by the Directives. [Tr. 299]

**11.** For example, Dr. Hammond testified that fifteen tubal ligations, or sterilizations, were performed at St. Agnes during the time period for which information he analyzed was accumulated. [Tr. 238]. Of the fifteen procedures performed at the Hospital, only a single resident was permitted to observe—not participate in—a single procedure. [Id.]

program on the basis of *four* alleged deficiencies. The Hospital alleges that only the citation in family planning resulted from its religious beliefs. Plaintiff does not maintain that the remaining deficiencies were insignificant or that accreditation would not have been withdrawn had only the three other deficiencies been cited. St. Agnes contends that it cannot get the benefit of accreditation without giving up its religious tenets. However, it has not proven that its accreditation was withdrawn as a result of the citation in family planning.

The Court does not believe that plaintiff has established that its Catholic beliefs conflict with the ACGME's requirements. However, even if plaintiff has proven a burden on its free exercise rights, the Court believes that there was a compelling state interest to justify such an infringement.

### B. *Compelling State Interest and Feasibility of an Exemption*

Where a party has proven infringement upon free exercise, such an infringement must be subjected to strict scrutiny and can be justified only by proof by the defendant of a compelling interest. *Hobbie,* 480 U.S. at 141, 107 S.Ct. at 1049; *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432; *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795. The state may justify a limitation on religious liberty by showing that it "is essential to accomplish an overriding governmental interest." *Lee,* 455 U.S. at 258–259, 102 S.Ct. at 1055–1056 (citations omitted).[12]

The Court finds that the defendant's requirement of clinical training in family planning is justified by the defendant's compelling interest in satisfactory physician education. According to the testimony, clinical experience in the complete range of family planning procedures, including certain aspects of abortion, sterilization, and artificial contraception, is an essential element of any obstetrics-gynecology residency program.[13] Furthermore, it is obvious even to a lay person that family planning procedures and techniques constitute a substantial portion of an obstetrics-gynecology practice.[14] The ACGME has

---

**12.** The Supreme Court has used phrases other than "overriding governmental interest" to describe the standard applied. In *Sherbert,* 374 U.S. at 403, 83 S.Ct. at 1793, and *Hobbie,* 480 U.S. at 141, 107 S.Ct. at 1049, the Court stated that the infringement is required to serve a "compelling state interest," while in *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533, it was "only those interests of the highest order." It is no matter whether the terms are distinguishable, however, because the Court believes that the state's interest here meets all of these definitions.

**13.** At trial, Dr. Bernstine, Chairman of the Board of Appeals that heard plaintiff's case and director of an obstetrics-gynecology residency program at a Catholic hospital, explained why such training is important:

> Q. In your opinion as a medical educator, is it important that each OB/GYN resident learn the clinical skills which may be used in performing pregnancy termination?
> A. Yes, I believe it should.
> Q. Why is it important in your opinion?
> A. The skills that are used in pregnancy termination are not limited to its use solely for that purpose but are used in our institution in the every day practice. For mid-trimester intrauterine death, we frequently use Laminaria to dilate the cervix to protect the integrity of that structure. For missed abortion or incomplete abortion, we use suction D & C. . . .

> These are the means by which other individuals will perform induced or elective abortions. So if we did not use those modalities, the resident would be severely penalized.
> 
> \* \* \* \* \* \*
> 
> He wouldn't be able to handle missed abortions, incomplete abortions, hydrocelectomy, mid-trimester fetal death. Or if later in life he decided he wanted to do an abortion, he couldn't do those either. He wouldn't be trained. He would not have received complete training in our specialty.

[Tr. 1000–01.] Dr. Bernstine offered similar testimony regarding the importance of resident training in contraceptive techniques and sterilizations. [Tr. 996–98.]

Dr. Hammond, a member of the RRC and one of the primary reviewers of plaintiff's program in 1985, testified that it is important that obstetrics-gynecology residency programs offer clinical training in family planning so that residents "may provide appropriate care for women and may counsel women as to their options. They may manage patients who have problems when those procedures have been done and, where appropriate, may accomplish the procedures for patients." (Tr. 944.)

**14.** According to the testimony, in 1982 thirty-three million out of fifty-five million women of child bearing age used artificial contraception; 21 percent of couples in the United States had used sterilization as a method of avoiding preg-

concluded that clinical training is required for a resident to be considered adequately trained in family planning procedures, techniques, devices and medications. The general public relies on the ACGME and the RRC to establish and maintain standards for physicians. Because the development and maintenance of standards for medical training require specialized medical knowledge and expertise, courts must give great deference to the ACGME'S judgments. *Medical Inst. of Minnesota v. National Ass'n of Trade and Technical Schools,* 817 F.2d 1310, 1314 (8th Cir.1987); *Rockland Institute v. Association of Indep. Colleges and Schools,* 412 F.Supp. 1015, 1018 (C.D. Cal.1976); *Parsons College v. North Central Ass'n of Colleges and Secondary Schools,* 271 F.Supp. 65, 73 (N.D.Ill.1967); *Interfaith Medical Center v. Sabiston,* 136 A.D.2d 238, 243, 527 N.Y.S.2d 48, 51 (1988) (granting deference to and upholding the ACGME's special requirements for surgical residency programs), *vacated in part,* 143 A.D.2d 173 (1988). This Court believes, as it has previously acknowledged, *St. Agnes,* slip op. at 16–17 (D.Md. Dec. 1, 1988), that judicial deference is due the ACGME's accreditation determinations.

Of critical importance in this area is that St. Agnes' residency program, like other such programs, trains residents of all religious backgrounds and beliefs. St. Agnes imposes its Catholic philosophy on its residents, many of whom are not Catholic, by requiring that they abstain from participating in and getting clinical training in certain proscribed procedures during the pendency of their residencies. Once a resident gets his license, however, she/he has the right to perform abortions and sterilizations, and to prescribe contraceptives. The defendant and the public surely have an overwhelmingly compelling interest in ensuring that these procedures are performed by competently trained physicians.

The plaintiff bases its challenge to the compelling interest rationale on an exception granted by the ACGME to individual residents who refuse to participate in pro-

cedures that they oppose on religious or moral grounds. In the "Special Requirements" the defendant provides an exception to the requirement of clinical experience "[w]hen the trainee [resident] for religious or moral reasons does not wish to participate in the proposed procedures." [Plaintiff's Ex. 5 at pp. 49–50]. If a resident is religiously opposed to participating in a procedure, defendant does not force that resident to forego her/his religious beliefs in order to be considered adequately trained. St. Agnes argues that the provision of this individual exception is inconsistent with defendant's denial of a similar exception for institutions that sponsor residency programs, and that such an inconsistency demonstrates the absence of a compelling government interest.

The Court disagrees. A similar argument was rejected by the Supreme Court in *Lee.*

> Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees. Congress drew a line [in the social security legislation], exempting the self-employed Amish but not all persons working for an Amish employer.

*Lee,* 455 U.S. at 261, 102 S.Ct. at 1057. Similarly, the fact that the ACGME has an individual resident exemption does not require it to provide a broader exemption to cover entire residency programs, which include residents of all religious faiths and beliefs.

Moreover, there is an obvious practical policy distinction between an individual exemption and an institutional exemption. An individual resident who declines, for moral or religious reasons, to participate in a particular procedure offers strong assurance that she/he will not employ that procedure in post-graduation practice. St. Agnes requires its residents, who are of different moral and religious beliefs, to abstain from participating in and refuse clinical training in certain proscribed proce-

nancy; and, 1.6 million abortions were performed—approximately one for every 2.5 live

births. [Tr. 939–940].

dures while under contract with St. Agnes. Such an arrangement does not offer any assurances that once St. Agnes' residents finish their training they will not perform those procedures as practicing physicians.

The Hospital seeks a religiously-based exemption from the training requirements which defendant applies to all obstetrics-gynecology programs. Assuming the plaintiff has proven the existence of a sincere religious belief that is burdened by a government requirement, the Court has found that a compelling governmental interest exists. The issue remaining is whether accommodation of St. Agnes' Catholic beliefs would "unduly interfere with fulfillment of the governmental interest." *Id.* at 259, 102 S.Ct. at 1056. Where a program that serves a compelling interest must be carried out on a uniform, nationwide basis, a religiously-based exemption from the requirements of the program would impair the compelling interest and, consequently, is not constitutionally required. *Id.* at 252, 102 S.Ct. at 1051.

In *Lee*, the Court addressed the feasibility of granting an exemption from application of the requirements of the social security system to an Amish employer who opposed participation in the system on religious grounds. The Court found that forced participation in the system would violate the claimant's genuinely held religious beliefs and that there was an overriding governmental interest in assuring participation in the social security system. *Id.* at 256–259, 102 S.Ct. at 1054–1056. The Court then turned to the remaining inquiry of "whether accommodating the Amish belief will unduly interfere with fulfillment of the governmental interest." *Id.* at 259, 102 S.Ct. at 1056. The Court upheld the government's refusal to grant an exemption from the requirements of the system, stating:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the

limits they accept on their own conduct as a matter of conscience and faith are not to be super-imposed on the statutory schemes which are binding on others in that activity.

*Id.* at 261, 102 S.Ct. at 1057.

The Court in *Lee* recognized that a balance must be struck between the values of the defendant's system and the consequences of allowing religiously based exemptions. "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." *Id.* at 259, 102 S.Ct. at 1056. As in *Lee*, the ACGME's accreditation of residency programs is performed on a nationwide basis because a graduate of an accredited residency program can be licensed to practice obstetrics-gynecology anywhere in the country. Thus, the Court also believes the defendant has established that granting a religiously-based exemption to the ACGME's requirements would "unduly interfere" with the fulfillment of the defendant's goals.

The ACGME's accreditation system cannot bear the administrative burden of applying its standards with any of a number of exemptions to avoid interference with all institutionalized religious beliefs. The accommodation issue should not be analyzed "solely in terms of exempting the few adherents whose religious views were alleged to conflict with the law; rather, ... 'it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs.'" *Graham v. Comm'r of Internal Revenue Serv.*, 822 F.2d 844, 853 (9th Cir.1987) *quoting Lee*, 455 U.S. at 259–260, 102 S.Ct. at 1056. In this case, it would be difficult, if not impossible, for the ACGME to make exceptions from its requirements for institutions with different religious and ethical proscriptions. Moreover, the very goals of the medical educational system would be at risk if the ACGME were to permit certain institutions to opt out of providing clinical training in any subject that that institution might find objectionable. Because residents may per-

form those procedures after attending a program accredited by the ACGME, such an exception would defeat the very purpose of the defendant's uniform system.

The plaintiff does not articulate how the defendant could allow an exemption for Catholic institutions without sacrificing the very integrity of defendant's system. If the ACGME were to provide such an exemption, it would somehow have to take extraordinary measures to supervise and oversee any programs that refused to provide their residents with clinical training in family planning. To safeguard its compelling interest in satisfactory physician education, the defendant would have to carefully observe each resident who had completed training at a hospital exempted from the clinical training requirement to be sure that that physician did not perform any of those procedures in which she/he was not adequately trained. Such a policing system would be impossible to administer.

Thus, the Court finds that there is no less restrictive method of administering defendant's system. Any imaginable accommodation of St. Agnes' Catholic beliefs would unduly interfere with the defendant's goals.

> While belief is a citadel into which the state may not intrude, the individual's right of free exercise, although constitutionally protected, always has been balanced against the state's interest in applying its neutral rules of conduct evenhandedly to all citizens.

*Madyun v. Franzen*, 704 F.2d 954, 958 (7th Cir.1983) *cert. denied* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). The ACGME's interest in applying its neutral rules to protect the public far outweighs the Hospital's rights in this case.

Accordingly, the Court will enter judgment in favor of defendant on plaintiff's substantive due process claim.

## III. DISCRIMINATORY INTENT UNDER SECTION 1983 AND SECTION 1985(3)

■ St. Agnes next claims that the withdrawal of accreditation violated its Fourteenth Amendment right to the equal protection of the laws under 42 U.S.C. § 1983 [15] and its right to religious freedom under 42 U.S.C. § 1985(3).[16] In a Section 1983 action, the plaintiff must prove that the defendant deprived plaintiff of a right secured by the "Constitution and laws" of the United States and that such a deprivation was "under color of law." *Adickes v. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Similarly, a plaintiff in a Section 1985(3) action must show that the defendant conspired to deprive plaintiff of a federally protected right, *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and that "state action" was present. *Bellamy v. Mason's Stores*, 508 F.2d 504 (4th Cir. 1974) ("state action" required when claim is based on discrimination other than race). Further, proof of "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Proof of anti-Catholic animus is required under Section 1985(3) as well. *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *United Land Corp. v. Clarke*, 613 F.2d 497, 501 (4th Cir.1980). The Court has already addressed the "state action" issue. In this section, it will analyze whether the plaintiff has proven discriminatory animus.

■ The Supreme Court and the Fourth Circuit have adopted the following factors for determining whether conduct was motivated by a discriminatory purpose: (1) whether the conduct had a discriminatory

---

**15.** Section 1983 provides, in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the D.C. subjects, or causes to be subjected, any citizen of the U.S. ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**16.** Section 1985(3) allows recovery against two or more persons engaged in a conspiracy to deprive a citizen of rights or privileges.

impact, or burdened one class of persons more than another; (2) the historical background of the challenged conduct; (3) the degree to which the conduct departed from either normal procedural sequence or normal substantive criteria; and (4) the contemporaneous statements of those who made the decisions. *Talbert v. City of Richmond*, 648 F.2d 925, 929 (4th Cir.1981) *cert. denied* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982), *citing Arlington Heights*, 429 U.S. at 264–268, 97 S.Ct. at 563–565. Having considered the factors articulated, the Court finds that the defendant's conduct was not motivated by a discriminatory purpose.

First, St. Agnes contends that the ACGME's accreditation process had a discriminatory impact on Catholic obstetrics-gynecology programs. Specifically, James Castellano, M.D. Chairman of St. Agnes' Obstetrics–Gynecology Department, testified that he reviewed program files of 307 obstetrics-gynecology programs that were accredited by defendant between 1981 and 1986. Dr. Castellano focused his study on programs sponsored by Roman Catholic institutions and programs cited by the RRC for a deficiency or concern in the area of family planning.

The review of the programs showed that slightly less than 15% of the programs were Roman Catholic. Further, eighteen of the 307 programs had been cited for a deficiency or a concern in family planning between 1981 and 1986 and, of those eighteen programs, fifteen were Roman Catholic. Thus, Roman Catholic programs represented 83% of all the programs cited by defendant between 1981 and 1986 for a deficiency or concern in the area of family planning. Moreover, the evidence shows that four of the fifteen Catholic programs that had been cited by defendant as deficient in family planning had their accreditation withdrawn, in part, because of the family planning deficiency. Plaintiff concludes from this evidence that defendant's practice of requiring clinical training in abortion, sterilization and artificial contraception has a disproportionate impact on Roman Catholic programs.

To rebut this evidence, the defendant argues that the methodology used by Dr. Castellano in his study is suspect because he is not a statistical expert, he failed to differentiate between a "deficiency" and a "concern", and the method used to categorize the programs was inexact. Thus, defendant argues that the Court should give this evidence little weight. Although Dr. Castellano's statistical expertise is questionable, defendant was unsuccessful in impeaching Dr. Castellano's analysis at trial.

The ultimate question in this case, however, is whether the ACGME withdrew accreditation from St. Agnes as a result of anti-Catholic animus. The only impact evidence bears on citations of deficiencies in family planning and not on withdrawal of accreditation of Catholic-sponsored programs. For that reason, the Court finds that the statistical evidence is not directly relevant to the issue at hand and has limited probative value. Furthermore, official action will not be held unconstitutional solely because it results in disproportionate impact. *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563. The Court stated that "... impact alone is not determinative, and the Court must look to other evidence." *Id.* at 266, 97 S.Ct. at 564 (footnotes omitted).

The historical background of the decision and whether it "reveals a series of official actions taken for invidious purposes" is another source of evidence of discriminatory intent. *Id.* at 267, 97 S.Ct. at 564. As proof of discrimination in the historical context, plaintiff first points to the disproportionate impact evidence. Again, the Court finds that this evidence has little probative value and does not support a finding of official actions taken for invidious purposes. Plaintiff also points to ACGME program files showing references, from various sources, to the religious beliefs or ethics held by certain Catholic-sponsored programs. The Court believes that these comments likewise fail to show a historical pattern of invidious discriminatory intent. Instead the Court finds that these notations indicate only defendant's acknowledgement and consideration of the Catholic

ethics and proscriptions present in specific programs.

For instance, the plaintiff points to a document in the program file of Mount Carmel Health Center, continuing probationary accreditation status of its program. The document references the basis of the decision, in part, on the following statement in the file.

The Catholic ethics present in the hospital was also considered to be a weakness of the program. Residents felt that these ethics constrained the ability of the faculty to train them in methods of Family Planning.

[Plaintiff's Ex. 194 at p. 31]. The reference indicates that the residents themselves felt that they were receiving inadequate family planning training perhaps as a result of the Catholic ethics of the hospital.

The other notations cited by the plaintiff demonstrate only acknowledgement of the Catholic beliefs of certain programs. Rather than documenting invidious discriminatory intent, the Court believes that the comments in the program files indicate an even-handed, religiously neutral application of the ACGME standards, taking into account any religious limitations imposed by Catholic affiliation. Thus, the historical background does not evidence a discriminatory motive.

The specific sequence of events leading up to the defendant's action and any departures from normal procedure may also provide evidence of the decisionmaker's purposes. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564. St. Agnes alleges that defendant's actions in withdrawing accreditation represent a departure from defendant's regular practice and, as such, that the events leading up to the decision indicate anti-Catholic animus.

First, plaintiff argues that the very basis for defendant's withdrawal of accreditation from plaintiff's program was contrary to its written procedures. Specifically, plaintiff contends that defendant may only withdraw accreditation when plaintiff fails to correct its previously cited deficiencies and not when it has corrected prior deficiencies

and new deficiencies arise. Defendant's Manual of Structure and Functions ("Manual") requires the withdrawal of accreditation when "a program holding probationary accreditation has failed to correct its deficiencies and thus cannot meet the criteria required for full accreditation." (Plaintiff's Ex. 7 at pp. 3–4). In withdrawing accreditation from St. Agnes' program, defendant listed nine deficiencies, only four of which had been previously cited. Defendant did not cite five of the nine deficiencies before withdrawing accreditation. The Court does not believe this argument raises an inference of discriminatory animus. Plaintiff interprets that portion of the Manual to mean that withdrawal is only permitted when a program fails to correct *all* of its *previously cited* deficiencies. However, the Manual does address not only *previously cited* deficiencies but *any* deficiencies. Nowhere in the Manual does it state that defendant cannot withdraw accreditation when a program has failed to correct only some of the previously stated deficiencies. Nor does the Manual state that the defendant cannot withdraw accreditation when there are new deficiencies in addition to some which were previously cited. Furthermore, the then Chairman of the ACGME testified at trial that accreditation can be withdrawn even though previously assessed deficiencies have been corrected if new and serious deficiencies have arisen, evidencing an inability to substantially comply with the General and Special Requirements. The Court believes this is a reasonable interpretation of the quoted portion of the Manual and finds that testimony credible. Thus, the Court finds that the defendant's citation of new deficiencies was not a departure from its normal procedures.

Next, plaintiff makes much of the fact that individual program reviewers' notes are absent from St. Agnes' program file. Defendant's Manual requires that RRC members who review a program must:

Present a clear statement in the form of a motion on the disposition of a program. The motion should indicate the basis for the recommendation and the specific rela-

tionship to the "General" and "Special Requirements" of the Essentials of Accredited Residencies.

The motion should include the accreditation status (i.e., accreditation, accreditation withdrawn, probations, etc.), reasons for recommending the accreditation status (i.e., deficiencies, concerns), and the basis upon which the judgment is made (i.e., documented deficiencies in the record, specific areas of failure to meet the "General" and "Special Requirements" of the Essentials).

[Plaintiff's Ex. 7 at p. 11]. Plaintiff argues that the absence of such a motion and note raises an inference of discriminatory animus. Defendant contends that, rather than being a procedural irregularity, it is defendant's policy to discard the individual reports and supplant them with the RRC's plenary decision because the Manual requires the Chairman of the RRC to "assure that a clear statement of the actions and recommendations taken represent the Residency Review Committee rather than individual reviewers." [Plaintiff's Ex. 7 at p. 9]. Although there may not have been a "policy," the testimony indicated that it was in no way abnormal to destroy individual reviewer's notes after the RRC made a plenary decision. Thus, the absence of such notes is not evidence of a departure from normal procedures or discriminatory animus.

Plaintiff also argues that the "Pink Sheets" or Chairman's Documents prepared after St. Agnes' review were not sufficiently detailed. The defendant's Manual requires the Chairman to:

assure that a clear statement of the actions and recommendations taken represent the Residency Review Committee rather than individual reviewers. Actions and recommendations should be made in the form of a motion voted by the Residency Review Committee and recorded at the time of meeting. In each case, this motion should indicate the basis for the recommendations and their specific relationship to the "General and Special Requirements" of the Essentials of Accredited Residencies. Documentation of recommendations is essential since these actions and recommendations may be examined at public hearings.

[Plaintiff's Ex. 7 at p. 9]. Again, the Court does not find that this lack of detail was a departure from normal procedure or was used to conceal an ulterior motive of discriminatory intent.

Another indicator of discriminatory animus may be departures from normal substantive considerations. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564–565 ("Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."). In the final analysis, St. Agnes really does not dispute that the RRC followed its normal substantive factors in withdrawing plaintiff's accreditation. It is the normal practice of the defendant to require all obstetrics-gynecology programs to provide clinical experience in family planning. Plaintiff believes that there should be an exception for Catholic institutions. Because there is no such exception, the RRC clearly applied the same substantive factors it usually considered important. This fact weighs against a finding of discriminatory animus.

Also relevant in the motive inquiry is any "legislative or administrative history, . . . especially where there are contemporary statements by members of the decision-making body, minutes of its meeting, or reports." *Id.* at 268, 97 S.Ct. at 565. The Court agrees with the defendant that the contemporary statements of those involved in reviewing the St. Agnes program are entirely neutral.

Plaintiff contends that the testimony at trial [17] of Dr. Hammond, a member of the RRC who was responsible for the review of plaintiff's program, evidences discriminatory animus. Specifically, Dr. Hammond stated that he was "not surprised" that Catholic hospitals had been cited frequent-

---

**17.** "[C]ontemporary statements by members of the decisionmaking body" include those mem-

bers' statements at trial. *Arlington Heights,* 429 U.S. at 268, 97 S.Ct. at 565.

ly for deficiency in the area of family planning. He went on to testify:

> Certainly I would anticipate in the Roman Catholic sponsored institution that the emphasis of the citation on the basis of inadequacy of family planning would be included, but I think there are other reasons beyond that. I think that you would expect that those programs would more likely be, for example, independent programs in smaller hospitals in communities ... So I think the number, the amount of resources and faculty and all the other elements that enter the equation are less likely to be broad-based in those institutions as they would in the remaining number of institutions present.

[Tr. 961–962]. The statement at trial was simply an acknowledgment that Catholic-sponsored programs may often be different than those not religiously affiliated.

Plaintiff also points to an article written by three of defendant's employees, which was published in the June, 1983, *Journal of Reproductive Medicine* entitled "Common Accreditation and Education Problems in Obstetrics–Gynecology Residencies." In listing the common problems in obstetrics-gynecology residencies, the authors included "[i]nsufficient experience with pregnancy interruption procedures" and stated that "[r]esidents must be taught these procedures but are not required to employ them in training." [Plaintiff's Ex. 256 at p. 400]. Plaintiff contends that the quoted statement evidences anti-religious animus. However, the Court believes that the statement raises no such inference and is entirely consistent with the major premise in this case, that is, that defendant requires clinical training in family planning, including, in

some form, pregnancy-interruption procedures.

Having carefully analyzed the factors set forth by the Court in *Arlington Heights,* the Court finds that plaintiff has failed to sustain its burden of proving discriminatory intent. In sum, plaintiff's evidence in support of its allegation of discriminatory intent proves nothing more than defendant's uniform application of its requirements, without regard to religious affiliation. Therefore, the Court will enter judgment in favor of defendant on plaintiff's claims under 42 U.S.C. § 1983 & § 1985(3).[18]

## IV. CONSTITUTIONAL AND COMMON LAW PROCEDURAL DUE PROCESS

St. Agnes argues that defendant violated its constitutional right to due process. The Fourteenth Amendment prohibits any state from depriving "any person of life, liberty or property without due process of law." In order to prove a procedural due process violation of a constitutional magnitude, plaintiff must establish that the state deprived it of a protectable property interest without adequate procedural safeguards. The Court has previously addressed whether defendant's action amounts to that of the "state" and the defendant does not contend that the right to accreditation of a residency program is not a protectable interest within the meaning of the due process clause. Therefore, the issue to be addressed is whether the procedures used by the ACGME were fundamentally fair.

Regarding its determination of whether St. Agnes received adequate constitutional due process, plaintiff urges the Court to follow *Christhilf v. Annapolis Emergency*

---

**18.** It should be noted that the plaintiff has not proven that a conspiracy existed and the Court would enter judgment for the defendant on that basis as well. A conspiracy under Section 1985(3) does not exist where the individual parties acted only in furtherance of their corporate or agency responsibilities. *Eggleston v. Prince Edward Volunteer Rescue Squad,* 569 F.Supp. 1344, 1352 (E.D.Va.1983). "Employees of an agency, required by their duties to work in concert, cannot, for that reason, be held to have violated 42 U.S.C. § 1985(3)." *Clark v. Louisa*

*County School Board,* 472 F.Supp. 321, 324 (E.D. Va.1979), *citing Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972). Plaintiff's theory is that the ACGME constitutes an ongoing conspiracy by virtue of the appointment of its individual representatives by the sponsoring organizations. The Court finds that plaintiff failed to introduce any evidence that ACGME representatives or RRC representative acted as anything but a single entity in withdrawing accreditation from plaintiff's program.

*Hospital Association, Inc.,* 496 F.2d 174 (4th Cir.1974), a case involving the denial of hospital staff privileges to a physician. In *Christhilf,* the Court interpreted due process to include "reasonable notice of the charge, adequate time to prepare his case, the right to present evidence in his behalf, the right to rebut evidence against him, and the right of cross-examination." *Id.* at 178–179, 180. The defendant, on the other hand, relies on *Ramirez v. Ahn,* 843 F.2d 864 (5th Cir.1988), *cert. denied,* 489 U.S. 1085, 109 S.Ct. 1545, 103 L.Ed.2d 849 (1989), a case involving the revocation of a physician's license. The Court in *Ramirez* applied a more liberal standard, holding that the Constitution requires "adequate notice and an opportunity to be heard by an appropriate tribunal," and not a hearing that was "letter perfect or the best that it could have been." *Id.* at 869. Recent case law, including Supreme Court cases which post-date the *Christhilf* decision, advocate a more flexible and somewhat more liberal standard than that applied by the Fourth Circuit in *Christhilf.*[19] Simply put, the determination should be made on a case-by-case basis.

The due process clause requires that any deprivation of life, liberty or property "be preceded by notice and an opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). In determining the type of process required, this Court must balance the government's interest in efficient administration against the private interest involved. *Id.* at 543, 105 S.Ct. at 1493. The factors to be considered are (1) the private interest at stake, (2) the risk of erroneous deprivation through the current procedures and probable value of additional or different procedures, and (3) the government's interest, including the governmental function involved and administrative burdens imposed by additional procedural requirements. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Before addressing each of plaintiff's allegations in detail, the Court will briefly analyze the constitutional factors set forth in *Mathews* as they apply to this case. Although the Hospital's interest in this case, accreditation of its obstetrics-gynecology program, may amount to a property interest, it is not inordinately strong. *Cf. Yashon v. Hunt,* 825 F.2d 1016, 1022 (6th Cir.1987) (plaintiff had "significant interest in being reappointed to the attending medical staff in order to maintain his professional reputation and his income."); *Monumental Health Plan, Inc. v. Department of Health and Human Services,* 510 F.Supp. 244 (D.Md.1981) ("It is clear that [plaintiff's] interest in the [defendant's] actions goes to the heart of its ability to remain in business."). In contrast, the ACGME's interest in assuring that all residents are adequately trained and in protecting patients is extremely strong. The ACGME also has an important interest in administering its accreditation process efficiently. The risk of an erroneous deprivation of St. Agnes' interest was minimal in light of the procedures followed. The Hospital was given ample notice of its deficiencies and had been placed on probation more than once. It had an opportunity to rectify the problems and to be heard on reconsideration and on appeal. Having weighed the relevant criteria in light of the evidence adduced at trial, the Court finds that the ACGME's process was fully consistent with the constitutional requirement of "notice and an opportunity to be heard."[20]

In case the defendant's actions are found to be private rather than "state action," the plaintiff alleges, in the alternative, that the withdrawal of accreditation violated its "common law right to fair dealing." Many courts have recognized a state or common

**19.** The Court does not wish to discredit the *Christhilf* opinion in anyway. It simply wants to emphasize that the overall concept of due process is a flexible one and the type of procedural protection required in a particular situation depends largely upon the circumstances of

that situation. *Morissey v. Bremer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**20.** Notwithstanding this conclusion, the Court will address the constitutional standard as it relates to each of plaintiff's due process arguments later in this Memorandum.

law right to fair procedure by a private professional organization or accreditation association when the association makes a decision affecting one of its members. The D.C. Circuit explained when it would be appropriate for a court to review such a decision.

> Where membership in, or certification by, such an association is a virtual prerequisite to the practice of a given profession, courts have scrutinized the standards and procedures employed by the association notwithstanding the recognition of the fact that professional societies possess a special competence in evaluating the qualifications of an individual to engage in professional activities. The standards set must be reasonable, applied with an even hand, and not in conflict with the public policy of the jurisdiction.

*Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schools, Inc.,* 432 F.2d 650, 655 (D.C. Cir.1970) *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

In this case, accreditation by the defendant is a prerequisite to the operation of an obstetrics-gynecology program. Thus, this Court may review the procedure defendant followed, applying rudimentary notions of fairness. It should be emphasized, however, that in doing so, courts should give the defendant organization great deference because "the matter of accreditation is best left to the professional judgment of those in the field ..." *Transport Careers v. National Home Study Council,* 646 F.Supp. 1474, 1481 (N.D.Ind.1986) *citing Rockland Institute v. Association of Indep. Colleges,* 412 F.Supp. 1015, 1018 (C.D. Cal.1976).

Where an association is a quasi-public organization, courts have recognized that the association owes its members a common law fiduciary duty to follow fair procedures reasonably related to legitimate purposes. *Marlboro Corp. v. Independent Colleges & Schools, Inc.,* 556 F.2d 78, 79 (1st Cir.1977); *Transport Careers,* 646

F.Supp. at 1486. Assuring that residents are adequately trained for an obstetrics-gynecology practice is surely a legitimate purpose. A court's review of the decision of an accrediting association is limited to a determination of whether the association's actions were arbitrary or unreasonable. *Rockland Institute,* 412 F.Supp. 1015; *Falcone v. Middlesex County Medical Soc'y,* 34 N.J. 582, 170 A.2d 791, 800 (1961). In the accreditation context, the court in *Transport Careers* found that common law standards of fairness were met because "plaintiff had ample notice to prepare, received a detailed written report, responded to the report both orally and in writing, presented argument on its behalf, attended an oral hearing, and had the opportunity to be represented by counsel." *Transport Careers,* 646 F.Supp. at 1481–1482; *see also North Jersey Secretarial School v. National Ass'n of Trade,* 597 F.Supp. 477, 480–481 (D.D.C.1984) (finding due process satisfied where defendant provided ample notice to prepare for hearing, detailed complaint, opportunities to present evidence and argument in writing, and oral hearing with assistance of counsel), *vacated on other grounds,* 802 F.2d 1483 (D.C.Cir.1986).

■ St. Agnes tried to prove violations of due process on several grounds. In sum, plaintiff contends that defendant failed to provide St. Agnes with (1) adequate standards for accreditation, (2) adequate notice of the deficiencies, and (3) an adequate decision-making procedure by the Board of Appeals. The Court will address each of plaintiff's arguments before applying the due process standards, both constitutional and common law, that it has discussed above.

First, plaintiff argues that defendant's standards for accreditation were too vague to be understood and to give St. Agnes adequate notice. Plaintiff points to testimony from members of the RRC and the Board of Appeals which plaintiff believes is evidence that even they did not understand the defendant's standards.[21] However, the

---

21. For example, plaintiff cites the testimony of Dr. Bernstine, who acted as Chairman of the Board of Appeals. After testifying that he be-

lieved the standards were adequate, Dr. Bernstein further testified:

Court interprets that same evidence to mean that it is through the process of working with the standards on a continual basis that physicians come to understand how to apply and comply with the standards. The evidence shows that defendant's standards are directed to experts in the field of obstetrics-gynecology and their meaning is expanded by each program director's participation in the accreditation process. Plaintiff also contends that the General and Special Requirements were inadequate because the defendant did not promulgate strict numerical guidelines in each educational area. The evidence at trial showed the defendant believes that numbers of any given procedure alone are insufficient to measure the quality of an obstetrics-gynecology residency program. Instead, a program is evaluated by assessing, among other things, variety of procedures offered, difficulty level of procedures performed, and any complicating factors, as well as the resident's role in the procedure, and the faculty's role in the program. In fact, at one time the RRC considered the possibility of ascribing numerical quotas to certain types of procedures and rejected the idea. Thus, the Court finds that the lack of numerical guidelines does not make the standards unconstitutionally vague.

In determining whether the ACGME's or the RRC's requirements are indefinite under the common law or unconstitutionally vague, the Court must extend deference to the defendant's expertise. *Marjorie Webster*, 432 F.2d at 655–666; *Transport Careers*, 646 F.Supp. at 1480–1481. In *Rockland Institute*, the plaintiff, a business school, alleged that an accreditation association's standards were "vague" and the court, in granting the accreditation association's motion for summary judgment, held that the association's standards were sufficient to guide professionals in the field of education.

> Having lived with them for a fair number of years and talked with other programs directors and informally with some people at RRC, we have meetings, various meetings that are open to any program director or any obstetrician or gynecologist in which other organizations present their data, changes [they] propose or discuss. They have work-

In its attacks on standards, claiming them to be nebulous, the College relies upon the decisions holding statutes to be unconstitutional on the ground that they are so vague as to be unintelligible to men of ordinary intelligence [the constitutional argument]. The authority is inapposite. *The standards of accreditation are not guides for laymen, but for professionals in the field of education.* Definiteness may prove, in another view, to be arbitrariness. The association was entitled to make a conscious choice in favor of flexible standards to accommodate variation in purpose and character among its constituent institutions, and to avoid forcing all into a rigid and uniform mold.

*Rockland Institute*, 412 F.Supp. at 1018 (emphasis added), *quoting Parsons College v. North Cent. Ass'n of Colleges and Secondary Schools*, 271 F.Supp. 65, 73 (N.D. Ill.1967).

Extending due deference to the experts in the field who promulgated the General and Special Requirements, the Court concludes that, viewed as part of the dynamic accreditation process, the standards are sufficiently clear to guide those who have experience and training in the field.

Next, St. Agnes argues that the defendant's notice of deficiencies was inadequate because the notification process was contrary to defendant's own written procedures and because it deprived the Hospital of actual notice. For constitutional purposes, even if defendant failed to follow its own procedures in citing deficiencies and withdrawing accreditation of plaintiff's programs, defendant's notice can still pass constitutional muster. "[E]ven if an action by a government entity violates ·its own rules or those of the state, there is no *constitutional* deprivation unless the conduct also trespasses on federal constitu-

> shops where you can ask specific questions and after a period of time, you get a good feeling for what is expected of a residency program, what constitutes an adequately-trained resident, and the numbers games fades [sic] away.
>
> [Tr. 452].

tional safeguards." *Ramirez*, 843 F.2d at 867, *citing Franceski v. Plaquemines Parish School Bd.*, 772 F.2d 197, 200 (5th Cir.1985). However, as the Court discussed earlier in Section III, it does not find that defendant violated its own written procedures. The ACGME is entitled to deference in reasonable interpretations of its own rules. *See Hennessey v. National Collegiate Athletic Ass'n*, 564 F.2d 1136, 1143 (5th Cir.1977) ("It would be inappropriate under the circumstances for the Court to reject the association's interpretation of its own rule where the interpretation is certainly one of those reasonably suggested by the words of the by-laws."); *North Jersey Secretarial School*, 597 F.Supp. at 480 (finding that defendant association's conclusion was "based upon fact and ... well within the scope of the appeals panel's expertise and authority"). Defendant interprets the relevant portion of the Manual to permit withdrawal of accreditation when a program which has been on probation is cited for new, substantial deficiencies, evidencing its inability to comply with the General and Special Requirements. This is a reasonable interpretation of defendant's own rules and in no way represents a departure depriving plaintiff of notice that its probationary status could be withdrawn completely.

Plaintiff also argues that defendant's notice was inadequate because the Hospital was not advised of the nature of the cited deficiencies in sufficient detail to enable preparation of a response. Again, the Court will defer to defendant's interpretation of its own rules. The evidence shows that by the time St. Agnes moved for reconsideration and before its hearing before the Board of Appeals, it was given sufficient detail of the basis for withdrawal of accreditation. The Court heard no evidence to the effect that plaintiff ever requested more detailed information about the cited deficiencies. The record establishes that St. Agnes was afforded the notice to which it was entitled under both the ACGME procedural guidelines and constitutional and common law notions of due process.

Next, St. Agnes asserts that the defendant's appeals process was faulty in that: (1) the members of the Board of Appeals were selected in a manner contrary to defendant's written procedures, depriving plaintiff of impartial, unbiased decision-makers; (2) plaintiff did not have an opportunity to cross-examine the individual witnesses; and, (3) the Board of Appeals' decision-making procedure was constitutionally flawed.

In accordance with established ACGME guidelines, after St. Agnes requested a review of the withdrawal of accreditation before a Board of Appeals, the ACGME sent a list of directors of fully accredited obstetrics-gynecology residency programs to the program director of St. Agnes for his selection. The same list was sent to the Chairman of the RRC for Obstetrics–Gynecology. St. Agnes selected Dr. Bernstine and the RRC selected Dr. Wiser as panelists to serve on the Board.

Defendant's written procedures for appeals provides that after the two panelists are chosen "[a] conference telephone call will be held between the two panelists to select the third member ..." [Tr. 372; Plaintiff's Ex. 290]. Instead of jointly selecting a third panelist, defendant asked Dr. Wiser to rank four of the program directors who had agreed to serve as Board members and then asked Dr. Bernstine if he had any objections to that list. He did not. Dr. Miller was then selected as the third panelist. The testimony established that the defendant used this expedited selection method because of the Hospital's eagerness to convene an Appeals Board and conduct a hearing before the full ACGME meeting on June 2, 1985, and because the selection process of the third panelist took place over the winter holiday season. St. Agnes independently selected one of the three panelists, Dr. Bernstine, an obstetrics-gynecology residency program director at a Catholic institution who was interviewed by St. Agnes' program director before being selected. Dr. Bernstine did have a voice in selecting the third panelist. There was no evidence that St. Agnes objected to the composition of the Board at the time or that the Board was

biased or prejudiced as a result of the selection of Dr. Miller. *See North Jersey,* 597 F.Supp. at 480–481 n. 3 (granting accreditation agency's motion for summary judgement on "lack of fairness" complaint where plaintiff had approved composition of appeals panel and evidence showed no bias). Thus, the Court finds that this slight departure from defendant's written procedures was not prejudicial and did not amount to deprivation of due process.

Plaintiff next argues that it did not have the right to confront and cross-examine the individual decisionmakers at the Board of Appeals hearing. However, the evidence indicates that St. Agnes was permitted to request testimony from the representatives involved in evaluating the program and that the Chairman of the RRC was present at the hearing. St. Agnes apparently chose not to exercise its right to request the presence of RRC members for cross-examination purposes.

Plaintiff also takes issue with the deliberative process of the Board of Appeals, contending that it was so cursory and lacking in serious consideration as to violate due process standards. Although defendant's appeals process requires three panelists to sit on a Board of Appeals, Dr. Miller, could not attend St. Agnes' appeal because of a death in his family. St. Agnes agreed to proceed with the hearing with the understanding that Dr. Miller would participate in the decision-making. Plaintiff contends that, despite assurances at the hearing that the Board members would confer and reach a decision, the members never conferred and were predisposed to rule adversely to St. Agnes.

The evidence establishes that Dr. Bernstine and Dr. Wiser discussed the appeal after the hearing and that both men read the materials submitted by St. Agnes. At a later date, Dr. Miller who also reviewed the materials plaintiff submitted and a transcript of the hearing, conferred with Dr. Wiser about the decision. Dr. Bernstine, as chairman of the Board of Appeals, drafted a written recommendation to the ACGME. The Board unanimously found that the hearing did not substantially alter the previous decision with respect to four of the five cited program deficiencies, and it recommended withdrawal of accreditation.

The Court finds that plaintiff has not proven that the appeals procedures violated constitutional or common law notions of due process. Regarding the deliberative process, St. Agnes did not prove that the method used by the three Board members deviated from either written procedures for deliberation or normal practice. Further, the Hospital does not contest the decision on the basis that only two panelists were present for the appeals hearing because plaintiff admittedly consented to proceed in Dr. Miller's absence. And the Court does not find persuasive the fact that the method of appointing the third representative to the Board was at variance with defendant's written procedures.

The Court concludes that there was no due process violation at the appeals stage because the plaintiff introduced no evidence showing how the alleged procedural irregularity in composing the Board of Appeals or the conduct of the Board's deliberations could have affected its decision. Defendant discusses a case, relied on by plaintiff, which discusses factors useful in determining the existence of bias on the part of a decision-making body. These factors are:

> (1) a member has a direct pecuniary interest in the outcome; (2) a member has been the target of personal abuse or criticism from the person before him; (3) a member is enmeshed in other matters involving the person whose rights he is determining; (4) a member may have prejudged the case because of a prior participation as an accuser, investigator, fact finder or initial decisionmaker.

*Hackethal v. California Medical Ass'n,* 138 Cal.App.3d 435, 443, 187 Cal.Rptr. 811 (1982). None of those factors apply to this case. The Court finds it persuasive that there is no evidence in the record of any bias against plaintiff's program. Furthermore, the evidence establishes that if the Board had been composed differently, it would not have affected the outcome of the

**342**

decision because a majority vote of the Board of Appeals would have been sufficient to sustain their recommendation.

The Court finds that St. Agnes was provided with adequate notice of the deficiencies. At the Board of Appeals hearing, the Hospital submitted an extensive brief and was represented by counsel. St. Agnes had an opportunity to make an oral presentation, to offer testimony, and to request testimony from those involved in the evaluation of the program, all before an impartial tribunal. *See Transport Careers*, 646 F.Supp. at 1481–1482; *North Jersey*, 597 F.Supp. 480–481 (concluding that similar factors supported finding of adequate due process). For all the reasons stated above, the Court finds that the standards and procedures employed by the defendant comported with constitutional standards of due process and common law standards of fairness. Accordingly, the Court will enter judgment for the defendant on the constitutional and common law due process claims.

## V. BREACH OF CONTRACT

St. Agnes also alleges that defendant's actions constituted a breach of contract. Plaintiff's contention is that defendant's Bylaws, Manual, and General and Special Requirements constitute contractual obligations and that the Hospital's payment of the fees required by defendant provides monetary consideration for defendant's agreement to make accreditation decisions in accordance with defendant's policies and procedures. As discussed earlier, the Court finds that plaintiff has not established that defendant violated its own procedures in withdrawing accreditation from the St. Agnes program. Accordingly, the Court will grant judgment for the ACGME on the breach of contract claim.

## VI. MARYLAND CODE HEALTH–GENERAL § 20–214

■ St. Agnes also contends that Defendant's actions violated the Health–General Article of the Maryland Code. Section 20–214 provides, in pertinent part:

(b) Hospitals—(1) A licensed hospital, hospital director, or hospital governing board may not be required:

(i) To permit, within the hospital, the performance of any medical procedure that results in artificial insemination, sterilization, or termination of pregnancy; or

(ii) To refer to any source for these medical procedures.

(2) The refusal to permit or to refer to a source for these procedures may not be grounds for: ...

(ii) Disciplinary or other recriminatory action against the person by this State or any person.

Md.Health–Gen. Code Ann. § 20–214 (1990).

It is undisputed that St. Agnes refused to perform abortions and sterilizations, except in limited circumstances. And, previously, this Court has held that withdrawal of accreditation *may* be a form of retaliation. *St. Agnes Hospital v. Riddick*, 668 F.Supp. 478, 483 (D.Md.1987). However, this Court also stated that:

The scope of the section [20–214] is limited to those situations in which the negative consequence complained about is *directly* related to the refusal to permit these procedures within its facilities. Thus, in the instant case, if it is shown that the withdrawal of accreditation was due to factors other than St. Agnes' refusal to permit sterilization and abortions to be performed within its facilities, plaintiff's claim will fail.

*Id.* at 483.

The plaintiff has failed to prove that the withdrawal of accreditation was directly related to its refusal to perform the religiously verboten procedures. Instead, the evidence established that the withdrawal was a result of a number of factors, one of which was inadequate training in family planning. In addition, plaintiff has not established that the withdrawal of accreditation was a recriminatory act. Instead, it was merely an academic decision.

The Court found no cases construing Section 20–214 of the Maryland Code. The parties debate the meaning of "refer to" as

used in this section. Specifically, plaintiff argues that "refusal to refer" encompasses St. Agnes' refusal to send its residents on outside rotations to get clinical experience in abortion and sterilization procedures; defendant contends that the "refusal to refer" should be strictly construed to mean only referral of patients to other sources for the family planning procedures. The term "referral" is used elsewhere in Title 20 only in relation to referral of a patient. *See, e.g.,* Md.Health–Gen. Code Ann. §§ 20–201, 20–202, 20–203, 20–204 (1990). That indicates that the Court should apply the common use of the word "refer," that is, to refer patients.

However, the Court finds another phrase found in that subsection more worthy of attention. According to the Code, the plaintiff's refusal to perform the procedures or to refer to another source for the procedures must be "grounds for" the disciplinary action. The ACGME articulated the several deficiencies that were the basis for its decision to withdraw accreditation. Plaintiff did not prove that its refusal to permit or to refer to a source for abortions and sterilizations was grounds for the defendant's actions. Accordingly, the Court finds that defendant did not violate Section 20–214, and it will direct judgment in favor of the defendant on this Count.

In conclusion, for all the reasons stated in this Court's Memorandum, the Court will enter a separate Order entering judgment in favor of the defendant on all counts of the complaint and lifting the injunction issued by this Court on November 14, 1986.