

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-1994

# McKeesport Hospital v. Accreditation Council for Grad. Med'l Ed.

Precedential or Non-Precedential:

Docket 93-3194

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"McKeesport Hospital v. Accreditation Council for Grad. Med'l Ed." (1994). *1994 Decisions.* Paper 20.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/20

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-3194


MCKEESPORT HOSPITAL

V.

THE ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION,
an Unincorporated Association;
JOHN T. BOBERG, Ph.D. as Executive Secretary
of the Accreditation Council for Graduate Medical Education

THE ACCREDITATION COUNCIL FOR GRADUATE MEDICAL EDUCATION
and JOHN T. BOBERG, Ph.D.,
Appellants


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil Action No. 92-02335)


Argued December 10, 1993

Before:  BECKER and NYGAARD, Circuit Judges,
and YOHN, District Judge*

(Opinion Filed May 17, 1994)


RICHARD S. DORFZAUN, ESQUIRE
DAVID B. FAWCETT, JR., ESQUIRE
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222
DOUGLAS R. CARLSON, ESQUIRE (Argued)
GARY E. DYAL, ESQUIRE
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive
Chicago, IL 60606
Attorneys for Appellants


1

* Honorable William H. Yohn, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

ROBERT V. CAMPEDEL, ESQUIRE (Argued)
ANN BAILY, ESQUIRE
Doepken, Keevican, Weiss & Medved
600 Grant Street
USX Tower, 37th Floor
Pittsburgh, PA 15219
Attorneys for Appellee

WILLIAM M. JANSSEN, ESQUIRE
Saul, Ewing, Remick & Saul
3800 Centre Square West
Philadelphia, PA 19102
Attorney for Amici Curiae The American Board of Surgery, The American Board of Colon and Rectal Surgery, The American Board of Neurological Surgery, The American Board of Orthopaedic Surgery, The American Board of Plastic Surgery, The American Board of Thoracic Surgery, and The American Board of Urology

DOROTHY G. HARWOOD, ESQUIRE
The Federation of State Medical Boards
of the United States, Inc.
6000 Western Place
Suite 707
Forth Worth, TX 76107
Attorney for Amicus Curiae

JANET DUFFY CARSON, ESQUIRE
National Board of Medical Examiners
3930 Chestnut Street
Philadelphia, PA 19104
Attorney for Amicus Curiae

JOYCE McKEEVER, ESQUIRE
Office of Chief Counsel
Pennsylvania Department of State
619 Transportation and Safety Building
Harrisburg, PA 17120
Attorney for Amicus Curiae The Pennsylvania State Board of Medicine

JACK R. BIERIG, ESQUIRE
Sidley & Austin
One First National Plaza
Chicago, IL 60603
Attorney for Amici Curiae The American Medical Association and The American Dental Association

OPINION OF THE COURT

NYGAARD, Circuit Judge.

McKeesport Hospital brought this 42 U.S.C. § 1983 action against the Accreditation Council for Graduate Medical Education (the "ACGME") and the Executive Secretary of its residency review committee for surgery, alleging that their withdrawal of the accreditation of the Hospital's general surgery residency program violated due process. The district court entered a preliminary injunction blocking the accreditation withdrawal. Because we conclude that the ACGME's conduct was not state action, we will reverse.

I.

Pennsylvania's Medical Practice Act of 1985 (the "Act"), 63 Pa. Cons. Stat. Ann. §§ 422.1 – 422.25, requires that the admission standards, facilities, curricula, and training at any medical college or "medical training facility" in the Commonwealth "meet the requirements set by the [Pennsylvania State Board of Medicine (the "Board")] and any accrediting body which may be recognized by the board." Id. §422.23(a). The term "medical training facility" includes a medical college, hospital or other institution providing graduate medical training. Id. §422.2. Graduate medical training, which is commonly referred to as a residency, is defined in the Act as

> training approved or recognized by the board
> which is either:

3

> (1) accredited as graduate medical
> education by any accrediting body
> recognized by the board for the
> purpose of accrediting graduate
> medical education. . . ; or
> (2) provided by a hospital
> accredited by any accrediting body
> recognized by the board and is
> acceptable to an American specialty
> board towards the training it
> requires for the certification it
> issues in a medical specialty or
> subspecialty. . . .

Id. § 422.2.

> The Act provides that
> [i]t shall be the duty of the board, in its
> discretion, periodically to ascertain the
> character of the instruction and the
> facilities possessed by each of the medical
> colleges and other medical training
> facilities offering or desiring to offer
> medical training in accordance with the
> requirements of this act.

Id. § 422.23(b). If the Board deems a program inadequate, "the board shall not recognize the education or degrees obtained from [it] during the period of inadequacy." Id. § 422.23(c). The Board must provide "due notice" to any institution found not to meet its standards. Id. Its actions, moreover, are "subject to the right of notice, hearing and adjudication, and the right to appeal therefrom, in accordance with the provisions of Title 2 of the Pennsylvania Consolidated Statutes (relating to administrative law and procedure)." Id. § 422.9.

The Board has by regulation recognized the ACGME as the accrediting body for graduate medical training programs in Pennsylvania. The relevant regulation reads

> [t]he Board is responsible for determining
> the character of instruction and the

4

facilities possessed by each of the various medical education institutions and hospitals who carry out graduate medical education programs in this Commonwealth. The Council on Medical Education of the American Medical Association [the ACGME's predecessor] possesses the facilities and staffing required to perform evaluations of the qualifications of the various programs and also the mechanism for accreditation of acceptance programs. The Board and the Council . . . work cooperatively in evaluating and approving the training programs in this Commonwealth. A comity exists between the board and the Council . . . under which all intended observations of training programs for accreditation are communicated to the Board and the Board makes all requests for accreditation or investigation of training programs to the Council . . . . If an investigation of the programs of the various institutions in this Commonwealth is to be conducted, the Board will provide one of its members or appoint an individual to accompany the investigator on each occasion. An institution within this Commonwealth seeking approval of its programs by the Council . . . will be informed that action taken by the accrediting agency will be related to the Board.

49 Pa. Code § 17.23. The ACGME is a private, unincorporated association made up of representatives of five medical organizations –– the American Board of Medical Specialties, the American Medical Association, the American Hospital Association, the Association of American Medical Colleges, and the Council of Medical Specialty Societies –– that evaluates and accredits residency programs throughout the United States.

The ACGME's review is governed by its own set of standards, The Essentials of Accredited Residencies. The ACGME has organized twenty-six residency review committees, one for

5

each of twenty-six medical specialties, that evaluate the programs in each area under these standards.  The committee for surgery, for example, is composed of 12 members appointed by the American Board of Surgery, the American College of Surgeons, and the American Medical Association.

The evaluation process begins when an application is submitted by the residency program's director.  The committee then sends a surveyor to the training facility to verify the information.  When reviewing a program in Pennsylvania, the ACGME notifies the Board of the visit, and a Board member or representative may accompany the surveyor to the facility.  The surveyor meets with faculty and students, reviews program data, and submits a report to the committee.  The submission of the report ends the site surveyor's role; he or she does not participate in the committee's decision.

The residency review committee then reviews the report and the program's file, and recommends either full accreditation, probation, or withdrawal of accreditation.  A training facility that is dissatisfied with the recommendation may request reconsideration by the committee and, if the committee adheres to its position, may seek a hearing before an appeals panel consisting of three directors of accredited residencies in the program's specialty.  A facility requesting an appeals panel hearing receives a list of potential members from which it may delete up to one-third of the candidates; the panel is constituted from those who remain.  The facility may submit additional information at both the reconsideration and appeal

6

stages and may be represented by counsel and present witnesses before the appeals panel.

The appeals panel's recommendation, the material it considered, and a transcript of its hearing are reviewed and either adopted or rejected by the ACGME's executive committee. The executive committee's determination is then voted on by the ACGME, whose decision is final. A training facility whose accreditation is withdrawn may, however, reapply for ACGME accreditation at any time.

II.

McKeesport Hospital, a community hospital in McKeesport, Pennsylvania, offers graduate medical training in several specialties, including general surgery. The Hospital's general surgery residency program was first accredited by the ACGME's predecessor in 1961, although its ACGME accreditation has been provisional since 1979. The program has had Board recognition since the Board began recognizing residency programs under the Act.

After a November 1990 site visit and its review, the ACGME's residency review committee for surgery recommended withdrawal of the program's accreditation, citing five deficiencies that allegedly rendered the program not in substantial compliance with The Essentials of Accredited Residencies. The Hospital requested reconsideration and the committee, as a result, rescinded one of the deficiencies and extended the withdrawal's effective date by one year. The Hospital appealed to an appeals panel, which held a hearing and

7

ultimately affirmed the committee's action. The appeals panel's decision was adopted by the ACGME's executive committee and then by the entire ACGME, and the Hospital was notified that the program's ACGME accreditation would be withdrawn.

It does not appear that the ACGME communicated this decision to the Board. Rather, the Hospital sought review of the ACGME's decision by the Board. The Board, however, dismissed the case, concluding that it had no authority to intrude upon the ACGME's accreditation process and, because the Hospital had failed one of the two criteria to be a medical training facility in Pennsylvania, no jurisdiction over the Hospital's appeal. The Hospital appealed the Board's dismissal to the Pennsylvania Commonwealth Court.

Before the Commonwealth Court rendered any decision in the case against the Board, however, the Hospital commenced this action against the ACGME, alleging that its decision to withdraw the program's accreditation lacked due process.[0] After a three-day hearing, the district court made extensive findings of fact and conclusions of law and granted the Hospital's motion for a preliminary injunction to prevent the accreditation withdrawal from becoming effective. The ACGME appealed.

After this appeal was filed, the Commonwealth Court reversed the Board's dismissal order. McKeesport Hosp. v. Pennsylvania State Bd. of Medicine, 628 A.2d 476 (Pa. Commw. Ct.

---

[0]In addition to the due process claim, the Hospital's complaint asserted federal antitrust and Pennsylvania contract law claims. The district court dismissed the antitrust and breach of contract counts; that dismissal is not at issue on appeal.

1993).  The Commonwealth Court determined that under the plain language of the Act, the Board is "the final arbiter of matters involving the accreditation of medical training facilities in Pennsylvania," and remanded the case to the Board for a hearing. Although the court agreed that the Board could not intervene in the ACGME's accreditation process, it disagreed that the ACGME's decision ended the Board's inquiry.  Id. at 479 & n.12.  The court stated: "[a]ccreditation by the ACGME merely is a tool which establishes critical facts leading to the Board's recognition" of a medical training facility.  Id. at 479.  The court ordered that the program remain recognized until the Board holds a hearing and issues a final order in the case.  Id.  The Board has filed a petition for allowance of appeal to the Pennsylvania Supreme Court, but that court has not yet granted or denied allocatur.

III.

The district court had jurisdiction over the Hospital's section 1983 claim under 28 U.S.C. §§ 1331 and 1343(a)(3); we have jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1). We review the grant of a preliminary injunction to determine "whether there has been 'an abuse of discretion, a clear error of law, or a clear mistake on the facts.'"  Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 198 (3d Cir. 1990) (citation omitted).  If we find either or both of the fundamental preliminary injunction requirements -- a likelihood of success on the merits and the probability of irreparable harm if relief is

9

not granted -- to be absent, the district court's order cannot be affirmed.  Id.

The Fourteenth Amendment protects individuals against government action.  To succeed on the merits of its Section 1983 due process claim, the Hospital must therefore show that the action of the ACGME, a private entity, is "fairly attributable" to the Commonwealth of Pennsylvania.  Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 2753 (1982).  The district court concluded, based on the "close nexus between the ACGME and the Board" and "the delegation of the Pennsylvania State Board of Medicine's duties to the ACGME"  that it was likely that the Hospital would be able to do so.  Our review of this legal determination, a prerequisite to the grant of the injunction, is plenary.  John F. Harkins Co. v. Waldinger Corp., 796 F.2d  657, 658 (3d Cir. 1986), cert. denied, 479 U.S. 1059, 107 S. Ct. 939 (1987).

The question of whether a private accrediting body's decision constitutes state action is, for us, one of first impression.  In cases involving accrediting organizations other than the ACGME, a number of courts have not found state action. Medical Inst. of Minn. v. National Ass'n of Trade & Technical Sch., 817 F.2d 1310, 1312-14 (8th Cir. 1987); Peoria Sch. of Business, Inc. v. Accrediting Council for Continuing Educ. & Training, 805 F. Supp. 579, 581-83 (N.D. Ill. 1992); Transportation Careers, Inc. v. National Home Study Council, 646 F. Supp. 1474, 1478-79 (N.D. Ind. 1986); Dietz v. American Dental Ass'n, 479 F. Supp. 554, 556 (E.D. Mich. 1979); Parsons College v. North

10

Central Ass'n of Colleges & Secondary Sch., 271 F. Supp. 65, 70 (N.D. Ill. 1967). We have uncovered only one case where state action was found, Marjorie Webster Junior College v. Middle States Ass'n of Colleges & Secondary Sch., 302 F. Supp. 459 (D.D.C. 1969), rev'd on other grounds, 432 F.2d 650 (D.C. Cir.), cert. denied, 400 U.S. 965, 91 S. Ct. 367 (1970), but it was decided long before the Supreme Court's state action trilogy, Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S. Ct. 2744 (1982), Rendell–Baker v. Kohn, 457 U.S. 830, 102 S. Ct. 2764 (1982), and Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777 (1982), which binds us now.

These cases do not answer our question as to the ACGME, because the state action determination is a "necessarily fact bound inquiry." Lugar, 457 U.S. at 939, 102 S. Ct. at 2755. Before we begin that inquiry, however, we note that a New York state court indicated in dicta that an accreditation decision by the ACGME did not fall within the state action doctrine. Interfaith Medical Ctr. v. Sabiston, 133 Misc.2d 308, 309, 507 N.Y.S.2d 124, 125 (1986), aff'd in part and rev'd in part on other grounds, 136 A.D.2d 238, 527 N.Y.S.2d 48 (2d Dept. 1988). Moreover, although a Maryland district court found an ACGME accreditation withdrawal to be state action in St. Agnes Hosp. v. Riddick, 668 F. Supp. 478, 479–82 (D. Md. 1987), it later questioned that conclusion in light of the Supreme Court's decision in National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 109 S. Ct. 454 (1988), but did not resolve the issue

11

because it ruled for the defendant on other grounds. St. Agnes Hosp. v. Riddick, 748 F. Supp. 319, 326 (D. Md. 1990).

Because the Hospital's challenge is to the ACGME's decision to withdraw the program's accreditation alone, this case presents a "typical" state action issue -- "a private party has taken the decisive step that caused the [alleged] harm to the plaintiff, and the question is whether the state was sufficiently involved to treat that decisive conduct as state action" and thus permit the Hospital to sue the ACGME instead of the state Board. Tarkanian, 488 U.S. at 192, 109 S. Ct. at 462. State action may be found if the private party has acted with the help of or in concert with state officials. Compare Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S. Ct. 2077 (1991), and Lugar, supra, and Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970) (finding state action) with Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S. Ct. 1729 (1978) (finding no state action). Alternatively, it may be found when the private party has been "delegated . . . a power 'traditionally exclusively reserved to the State.'" Flagg Bros., 436 U.S. at 157, 98 S. Ct. at 1734 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S. Ct. 449, 454 (1974)). Finally, state action may be found if "there is a sufficiently close nexus between the state and the challenged action of the [private] entity so that the action of the latter may fairly be treated as that of the State itself." Jackson, 419 U.S. at 351, 95 S. Ct. at 453.

We conclude on the undisputed facts of this case that the ACGME's withdrawal of the program's accreditation was not

12

state action. First, it is certain that no state officials participated in the ACGME's accreditation withdrawal. The applicable standard is one of "overt, significant assistance." Edmonson, 500 U.S. at ___, 111 S. Ct. at 2084. Although a Board member did accompany the ACGME's site surveyor to the Hospital, he acted only as an observer, and played no part in the surveyor's inspection or in any stage of the ACGME's decision. This is not enough to make the ACGME's withdrawal decision state action. Cf. Flagg Bros., 436 U.S. at 156-57, 98 S. Ct. at 1733-34 (in a suit where the plaintiff was challenging a warehouse-man's threat to sell her belongings pursuant to a state self-help statute, the fact that the city marshal had supervised the plaintiff's eviction and arranged for her possessions to be stored at the defendant's warehouse did not constitute overt official involvement in the challenged conduct).

The district court concluded that the Board delegated its duties to the ACGME, thereby rendering the ACGME's actions fairly attributable to the state. We cannot agree. As the Commonwealth Court's decision makes clear, under the Act the state Board remains ultimately responsible for approving medical training facilities in Pennsylvania. Cf. Tarkanian, 488 U.S. at 195-98, 109 S. Ct. at 464-65 (finding no delegation when the state retained the ability to adopt or reject a private association's decision). Merely because the state Board deems its obligation met by following the ACGME's accreditation decisions does not imbue the ACGME with the authority of the state nor shift the responsibility from the state Board to the

13

ACGME.  The Board remains the state actor.  Moreover, even if a delegation occurred, that alone is insufficient.  For state action, the private actor must be exercising a power that is "'traditionally the exclusive prerogative of the state[,]'" Blum, 457 U.S. at 1005, 102 S. Ct. at 2786 –- for example, running an election, Terry v. Adams, 345 U.S. 461, 73 S. Ct. 809 (1953), or providing a municipal park, Evans v. Newton, 382 U.S. 296, 86 S. Ct. 486 (1966).  This, of course, is not the case here.

Medical residencies are a vital component of medical education, providing new doctors with a supervised transition "between the pure academics of medical school and the realities of medical practice."  Interfaith Medical Ctr. v. Sabiston, 136 A.D.2d 238, 239, 527 N.Y.S.2d 48, 49 (2d Dept. 1988).  The evaluation and accreditation of medical education in this country is neither a traditional nor an exclusive state function. Rather, United States medical schools have been privately accredited for nearly a century.  See Rosemary Stevens, American Medicine and the Public Interest 55–73 (1971).  The ACGME's predecessor, the Council on Medical Education, began accrediting medical schools in 1906, Siirila v. Barrios, 398 Mich. 576, 614, 248 N.W.2d 171, 186 (1976) (Williams, J., concurring), and has been reviewing and evaluating residency programs since the 1950s, Stevens, supra, at 378–414.  That, in doing so, the ACGME serves the public interest does not make it a state actor.  Rendell–Baker, 457 U.S. at 842, 102 S. Ct. at 2772;  Jackson, 419 U.S. at 352–55, 95 S. Ct. at 454–55.  Furthermore, although the state Board has taken on the function of approving Pennsylvania residency programs under the

14

Act, "that legislative policy choice in no way makes these services the exclusive province of the State." Rendell-Baker, 457 U.S. at 842, 102 S. Ct. at 2772.

The district court also found the connection between the state Board and the ACGME sufficient to turn the latter into a state actor. We must disagree. Sometimes, a state and an ostensibly private entity are so interdependent that state action will be found from their symbiotic relationship alone. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856 (1961) (finding state action based on lease relationship that benefitted and obligated both parties). The relationships of the University of Pittsburgh and Temple University to the Commonwealth provide an example. The Universities are designated by their governing legislation as "instrumentalit[ies] of the Commonwealth" and "State-related institution[s]." These statutes provide for one-third of the Universities' voting trustees to be appointed by state officials and for several officials to serve as ex officio trustees; allow the Commonwealth to set tuition and fee schedules; promise annual appropriations, to be used as the Commonwealth specifies; impose stringent reporting requirements as to fiscal and other affairs; authorize the same capital development assistance as allowed wholly-owned state colleges; and create tax exemptions for income derived from bonds the Universities issue and loans secured by mortgages on their properties. See Krynicky v. University of Pittsburgh, 742 F.2d 94, 101-02 (3d Cir. 1984), cert. denied, 471 U.S. 1015, 105 S. Ct. 2018 (1985); Braden v. University of Pittsburgh, 552 F.2d

15

948, 959-61 (3d Cir. 1977). The ACGME's relationship to the state is clearly distinguishable. The ACGME is self- governed and financed, and its standards are independently set; the state Board simply recognizes and relies upon its expertise.

Alternatively, a connection between the state and a specific decision of a private entity may render that decision chargeable to the state. See Jackson, 419 U.S. at 351, 95 S. Ct. at 453. Under this approach, however, state action will be found only "when [the state] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private decision] must in law be deemed that of the State[;]" "mere approval of or acquiescence in" the decision is not enough. Blum, 457 U.S. at 1004, 102 S. Ct. at 2786. The required state coercion or encouragement of the ACGME's actions is not present here.

The Hospital is challenging the ACGME's decision to withdraw the program's accreditation, not the Board's action in response. The Board, however, does not control or regulate the ACGME's standard-setting or decision-making processes. Although it recognizes them, state law does not dictate or influence those actions. Rather, the ACGME's decisions are "judgments made by private parties according to . . . standards that are not established by the State." Blum, 457 U.S. at 1008, 102 S. Ct. 2788. That the Board bases its approval of medical residency programs on ACGME accreditation does not turn the ACGME's decisions into state action. See Tarkanian, supra (state university's suspension of basketball coach in compliance with

16

NCAA recommendation did not convert NCAA decision into state action); Blum, supra (state officials' adjustment of Medicaid benefits in response to private nursing homes' decisions to discharge or transfer patients did not render the state responsible for those decisions).  To paraphrase the Supreme Court's conclusion in Tarkanian, it is more accurate to say that the Board conducts its approval of medical residency programs under color of the ACGME's policies than that those policies were developed and enforced under color of Pennsylvania law.  See Tarkanian, 488 U.S. at 199, 109 S. Ct. at 466.

## IV.

Accordingly, because we conclude the ACGME performed no state action, we will vacate the preliminary injunction order and remand the cause to the district court.

17

McKeesport Hospital v. The Accreditation Council for Graduate Medical Education, an Unincorporated Association; JOHN T. BOBERG, Ph.D., as Executive Secretary of the Accreditation Council for Graduate Medical Education, No. 93-3194

BECKER, Circuit Judge, concurring in the judgment.

I cannot agree with the majority that there is no state action in this case. As I read the record, Pennsylvania has totally ceded any meaningful responsibility to conduct reviews of residency programs to the Accreditation Council for Graduate Medical Education (the "ACGME"), and has delegated to the ACGME the power to find the critical facts that are necessary for the Pennsylvania State Board of Medicine (the "Board") to determine whether a residency program satisfies the Board's standards. In essence, the ACGME decides whether residents trained at such a facility can be licensed to practice in Pennsylvania. I believe that this delegation of power with respect to a function that will have a direct effect on licensing decisions is state action. I nevertheless concur in the judgment because I am satisfied that, when it withdrew accreditation of McKeesport's surgical residency program, the ACGME afforded McKeesport due process.

## I.   State Action

In this case, as the majority recognizes, a private party has taken the decisive step that injured the plaintiff. The case is, therefore, not controlled by National Collegiate Athletic Association v. Tarkanian, 488 U.S. 179, 109 S. Ct. 454,

18

102 L. Ed. 2d 469 (1988), which involved a situation in which the state took the final action that harmed the plaintiff. Consequently, we must determine whether state action exists either because there is a "nexus" between the Board and the ACGME, see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 453, 42 L. Ed. 2d 477 (1974), or a "joint participant" relationship between the Board and the ACGME, see Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S. Ct. 856, 862, 6 L. Ed. 2d 45 (1961).[0]  In my view there is state action under either a "nexus" or "joint participant" approach. That is because the relationship between the Board and the ACGME is sufficiently direct that the ACGME's functions can be fairly attributed to the Board, and because, as the state regulations make clear, the Board and the ACGME act in concert in determining whether a residency program will be licensed.

Although there is little actual participation by Pennsylvania in the residency reviews conducted by the ACGME, that is because the State has delegated the factfinding role to the ACGME.  The importance of this delegation should not be underestimated.  The ACGME finds the facts that determine whether a residency program should be accredited.  The Board so far has not independently reviewed residency programs, nor has it demonstrated any inclination to do so in the future.  The Board's role, even in light of the Commonwealth Court's decision in

---

[0]We have held that the Burton "joint participant" test survived the so-called Lugar trilogy.  See Krynicky v. University of Pittsburgh, 742 F.2d 94, 101 (3d Cir. 1984), cert. denied, 471 U.S. 1015, 105 S. Ct. 2018, 85 L. Ed. 2d 300 (1985).

19

<u>McKeesport v. Pennsylvania State Board of Medicine</u>, 628 A.2d 476 (Pa. Commw. Ct. 1993), seems to be limited to reviewing the adequacy of the record developed by the ACGME. Thus the ACGME, in effect, performs the threshold adjudicatory function in Pennsylvania's residency program approval scheme.

Although Pennsylvania has delegated to the ACGME only a threshold adjudicatory power and not the ultimate authority to approve the residency programs, it is clear that if the ACGME or a similar organization did not exist, the Board would have to perform the ACGME's function itself. See <u>Marlboro Corp. v. Association of Independent Colleges & Schools, Inc.</u>, 556 F.2d 78, 80 (1st Cir. 1977) (suggesting that state action exists when it appears that if the accreditation agency did not perform its function the government would do so itself). Delegation of this function to the ACGME does not change the nature of the function, and does not remove the process from constitutional mandates. Indeed, the State benefits financially by having the ACGME incur the expense of reviewing the programs, something we have said is an important factor in finding state action. See <u>Krynicky v. University of Pittsburgh</u>, 742 F.2d 94, 101 & n.9 (3d Cir. 1984), <u>cert. denied</u>, 471 U.S. 1015, 105 S. Ct. 2018, 85 L. Ed. 2d 300 (1985).

Moreover, the key accreditation cases upon which the majority relies, <u>Medical Institute of Minnesota v. National Association of Trade & Technical Schools</u>, 817 F.2d 1310, 1312–14 (8th Cir. 1987), <u>Peoria School of Business, Inc. v. Accrediting Council for Continuing Education & Training</u>, 805 F. Supp. 579,

581-83 (N.D. Ill. 1992), and <u>Parsons College v. North Central Association of Colleges</u>, 271 F. Supp. 65, 70 (N.D. Ill 1967), differ in critical respects from this case.[0] In <u>Medical Institute of Minnesota</u>, the plaintiff had claimed that state action existed because: 1) the accreditation decision would

[0] The majority also relies on two other cases which, in my opinion, do not strengthen its position. First, the majority states that <u>Interfaith Medical Center v. Sabiston</u>, 133 Misc.2d 308, 309, 507 N.Y.S.2d 124, 125 (1986), <u>aff'd in part and rev'd in part on other grounds</u>, 136 A.D.2d 238, 527 N.Y.S.2d 48 (2d Dept. 1988), held that the ACGME is not a state actor. But in <u>Interfaith</u> the entire discussion of the state action question was as follows: "[t]his court, at its level, will refrain from viewing plaintiff's complaint under the doctrine of 'State Action' nor expand the doctrine to embrace the allegations of plaintiff's complaint." <u>Id.</u> There is simply no analysis of the question.

Second, the majority cites <u>St. Agnes Hospital, Inc. v. Riddick</u>, 748 F. Supp. 319, 326-27 (D. Md. 1990) ("<u>St. Agnes II</u>"), as a case in which the court cut back on its earlier conclusion in <u>St. Agnes Hospital, Inc. v. Riddick</u>, 668 F. Supp. 478, 480 (D. Md 1987) ("<u>St. Agnes I</u>"), that the ACGME was a state actor. According to the majority, <u>St. Agnes II</u> "questioned its conclusion [that the ACGME was a state actor] in light of the Supreme Court's decision in [<u>Tarkanian</u>]." The majority, however, ignores the following language from <u>St. Agnes II</u>:

> The circumstances of <u>Tarkanian</u>, however, are certainly distinguishable from the facts sub judice. Most importantly, the final act that caused the alleged harm to Tarkanian was committed by a party conceded to be a state actor, while in this case, the ACGME has taken the decisive step. The Court in <u>Tarkanian</u> emphasized that the [National Collegiate Athletic Association ("NCAA")] was not authorized to directly discipline Tarkanian or any other state employee. In <u>St. Agnes</u>, the ACGME had the authority and did in fact make the final determination to withdraw plaintiff's accreditation. Consequently, <u>Tarkanian</u> is not analogous to the situation at hand.

This language hardly supports the majority's implication that <u>St. Agnes II</u> reversed itself on its state action conclusion. To the contrary, it appears that the court reaffirmed that the ACGME was a state actor.

affect eligibility of its students for federal aid; and 2) the accreditation agency was regulated by the Department of Education. In Peoria and Parsons, the plaintiffs made the eligibility for federal aid argument and added the argument that state action existed because the accreditation agency was incorporated, and thus a creature of state law.

The arguments asserted in those cases were easily disposed of under traditional state action doctrine. Collateral consequences of eligibility for federal aid is not enough for state action under Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777 (1982); a company is not a state actor merely because it is itself regulated, see Jackson, 419 U.S. at 352-55, 95 S. Ct. at 454-55; and a corporate charter cannot create "state action" because such a rule would transform nearly every business entity into a state actor, cf. Burton, 365 U.S. at 726, 81 S. Ct. at 862 (recognizing the need to avoid a rule that creates universal application of state actor status).

In this case, by contrast, McKeesport can point to much more than the collateral consequences of the negative accreditation decision, regulation of the accreditation entity, or a corporate charter to show state action. It can point to a statute, Pa. Stat. Ann. 63 tit., § 422.23, and a regulation, 49 Pa. Code § 17.23, which recognize 1) that the facilities of the ACGME are better suited to evaluate the programs, and 2) that the Board will rely on the ACGME when making its own decisions. Indeed § 17.23 recognizes a relationship of "comity" between the Board and ACGME which would require a formal exercise of state

22

power to be changed.  The Board made this clear in its briefs before the Commonwealth Court:  "In the event the Board should choose to withdraw its endorsement [of] the ACGME accreditation process, it will do so by amending its regulations."  Although the majority fails to recognize this comity between the Board and the ACGME, we have said before that such a relationship supports a finding of state action when ensconced in regulations.  See Krynicky, 742 F.2d at 94 (one factor supporting state action was the fact that relationships between the state and two universities were defined by statute and regulation, and a formal exercise of legislative power would be necessary to change that relationship).

Additionally, McKeesport can point to the fact that the ACGME's decisions have a direct impact on decisions made by the Board to recognize residency programs and, ultimately, to license doctors.  The directness of this relationship is something that the Board itself has demonstrated quite clearly in its briefs before the Commonwealth Court by taking the position that it does not even have jurisdiction to review the ACGME's decision.  In particular, the Board asserted that "[t]he Legislature has not conferred upon the Board the authority to be a 'super accrediting agency.'"  According to the Board, that power has been delegated: "[a]ccreditation by the ACGME is a tool which establishes a critical fact leading to the Board's recognition that an applicant's training meets the statutory requirements.  This is consistent with the Constitution of Pennsylvania and the law related to the delegation of governmental functions."  Indeed,

23

the Commonwealth Court accepted this characterization of the delegation of power to the ACGME in its opinion interpreting the statutory scheme.  McKeesport, 628 A.2d at 479.

The majority's statement that such a delegation is not enough because the delegation must be of a power which has been traditionally the exclusive prerogative of the state, is, I believe, out of step with current state action doctrine.  To begin with, the assertion seems to come too close to saying that the only time the exercise of state delegated power can create state action is when the power being exercised is traditionally the exclusive function of the state.  I am not sure that is even a correct statement of the "public function" approach after Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991), which seemed to eliminate the "exclusivity" requirement of the public function test for state action.  Id. at 2083, 2085 (describing the public function question as whether "the actor is performing a traditional governmental function").

A delegation of state authority can certainly show nexus or joint participation even if the function is not a traditional and exclusive state function.  That is the clear implication of Tarkanian, 488 U.S. at 195, 109 S. Ct. at 464, which asked whether there was a delegation of state power in the context of applying the Burton "joint participant" approach.  And Tarkanian was not novel in this respect.  Courts commonly hold that a state agency, like a county hospital district, for example, is a state actor even though it is not engaged in

24

actions that are traditionally the exclusive province of the state.  See, e.g., Stern v. Tarrant County Hosp. Dist., 755 F.2d 430, 433 (5th Cir. 1985), cert. denied, 476 U.S. 1108, 106 S. Ct. 1957, 90 L. Ed. 2d 365 (1986).  And state agencies are state actors largely because they are exercising some form of delegated authority.  Id.; see also Lombard v. Louisiana, 373 U.S. 267, 282, 83 S. Ct. 1122, 1129, 10 L. Ed. 2d 338 (1963) (Douglas, J., concurring) (stating that a state agency is a state actor because it has the requisite nexus).  Why should not the same be true when the state delegates authority to a "private" party?  As Edmonson put it, "[t]he fact that the government delegates some portion of [its] power to private litigants does not change the governmental character of the power exercised."  Edmonson, 111 S. Ct. at 2087.[0]

Furthermore, notwithstanding any theoretical relationship between the Board and the ACGME, the practical, day-to-day relationship between the Board and the ACGME evidences a delegation sufficient to create state action.  Tarkanian, although not controlling, is instructive on this point.  In Tarkanian, the Court held that there had not been a sufficient delegation of authority to the NCAA in part because the University of Nevada at Las Vegas ("UNLV") and the NCAA had "acted much more like adversaries than like partners engaged in a

---

[0]Nor do I think it makes a difference to the analysis that the ACGME claims that Pennsylvania has unilaterally deputized it to perform the accreditation decisions for the state.  As I see it, the question whether someone is a state actor depends on whether it is exercising (or purporting to exercise) state power, not whether it has sought such power.

25

dispassionate search for the truth." Tarkanian, 488 U.S. at 196, 109 S. Ct. at 464. It was largely on the basis of this adversarial relationship that the Court was able to distinguish the "joint participant" cases like Burton and Dennis v. Sparks, 449 U.S. 24, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980), which had found state action in part by concluding that the state and the private party had acted in concert. See Tarkanian, 488 U.S. at 196 & nn.16, 17; 109 S. Ct. at 464 & nn.16, 17.

No such adversarial relationship exists in this case. Quite to the contrary, the relationship between the Board and the ACGME is extremely close. As has been mentioned above, the Board quite clearly has taken the position that it will in no way challenge the ACGME's decisions and will simply rubber stamp any decision that the ACGME has made. Indeed, it does not wish even to review the ACGME's decisions, having taken the position that it has no jurisdiction over them. In terms of gauging the practical relationship of the Board and the ACGME, the Board's arguments are powerful evidence that the Board has done, and will continue to do, everything it can to pass off its accreditation responsibility to the ACGME.

Finally, while it may be true, as the majority states, that the accreditation of medical residency facilities is not a traditional and exclusive function of the state, there is little doubt that the ACGME's decision is a vital component of the licensing scheme for residency programs, and, ultimately, of the licensing scheme for doctors. Graduation from an approved and accredited residency program is a prerequisite to an unrestricted

26

license to practice medicine in Pennsylvania. See Pa. Stat. Ann. tit. 63, § 422.29(b). And licensing of doctors is, by all accounts, a traditional and exclusive state function, since it lies at the core of the state's police power (to protect the health and welfare of its citizens). We should be careful not to permit a state to insulate a critical component of that licensing scheme from constitutional requirements simply by delegating that component to a private organization.

In sum, Pennsylvania has formally deputized the ACGME to exercise the state's duty to collect and analyze the critical facts for determining the qualification of residency programs; the State directly benefits financially from this relationship with the ACGME; and the Board and the ACGME act in concert in making any accreditation decisions. I believe that these facts make the ACGME a state actor. I must therefore address the due process issues raised on this appeal.

## II. Due Process

Issues of procedural and substantive due process are by their nature highly contextual inquiries. Rules requiring adequate notice and an opportunity to be heard, as well as rules requiring that decisions be supported by substantial evidence and not be arbitrary and capricious, are little more than general guideposts when applied to any particular case. The facts dominate the inquiry. A review of the facts demonstrates that the ACGME provided McKeesport all the process it was due.

## A. Background

27

1.  The ACGME's procedures.

As the majority opinion mentions, the ACGME has in place an elaborate accreditation scheme that has both substantive and procedural components.  The substantive components are specified in The Essentials of Accredited Residencies (the "Essentials"), which details the requirements for accreditation. Among other things, the Essentials directs residency programs to provide certain types of surgical training and to ensure that each resident gets a similar range of operative experience.  It also directs programs to teach and to maintain a certain level of scholarly activity, such as publishing articles in peer-reviewed journals.  Programs must be in "substantial compliance" with the Essentials to be accredited.  Although this standard leaves the ACGME some flexibility when making accreditation decisions, the Essentials otherwise provides residency programs with fairly detailed guidance regarding the types of clinical and academic training they must provide.

The procedural components are specified in The Manual of Structure and Functions for Graduate Medical Education Review Committees (the "Manual"), which outlines the procedures for accreditation, including the procedures for withdrawing accreditation.  According to the Manual, before an accreditation can be withdrawn the ACGME must conduct a seven stage process: 1) the program director submits documents to the ACGME; 2) a site visit is made by a member of the ACGME field staff; 3) the ACGME's Residency Review Committee ("RRC") assembles the information and decides whether to withdraw accreditation; 4) the

28

RRC may reconsider an adverse ruling; 5) the ACGME's appeals panel decides whether the adverse ruling was supported by substantial or credible evidence; 6) the ACGME's Executive Committee reviews the appeals panel's ruling, and, if it agrees with the adverse ruling, informs the full ACGME; and 7) the ACGME, at a plenary session, makes the final decision whether to withdraw accreditation. Throughout the process the residency program may submit additional information about the program as long as the information relates to the status of the program before the review began.

2. Withdrawal of McKeesport's accreditation.

The McKeesport surgical residency program has had a long history of substandard performance. Although it has been involved in the accreditation process since the 1960's, it has never reached full accreditation status. The program has continuously been engaged in a cycle of provisional accreditation, followed by voluntary or involuntary withdrawal of accreditation, followed by reapplication.

This appeal is part of the latest cycle. Following its review of the McKeesport program in 1989, the RRC voted to grant provisional accreditation. At that time, however, the RRC expressed "serious concern" that five areas of the program were deficient: 1) basic science education, 2) scholarly activity, 3) operative data (which was unreliable), 4) operative experience (which was too variable), and 5) numbers of operations in several areas (they were insufficient).

29

The next review, the one at issue here, began in late 1990. Despite a generally positive review from the site surveyor, the RRC decided to withdraw McKeesport's accreditation. The RRC cited five areas of deficiency with citations to the relevant parts of the Essentials: 1) lack of scholarly activity, 2) failure to provide accurate data, 3) inadequate pre- and post-operative experience, 4) an excessive drop-out rate, and 5) otherwise deficient operative experience. As the RRC's review suggests, many of the problems that had been identified in 1989 remained in 1990.

After the adverse recommendation from the RRC, McKeesport exhausted all of the internal remedies available to it (outlined in the Manual). It first requested that the RRC reconsider its decision. The RRC complied. As part of the reconsideration procedure, two RRC committee members prepared separate reports on McKeesport's program and both recommended that RRC sustain the withdrawal of accreditation. Although the RRC rescinded one of the five areas of deficiency (the drop-out rate), it reaffirmed its decision to withdraw accreditation.

McKeesport then appealed. At the appeal, McKeesport was represented by counsel, made extensive oral argument, and submitted four volumes of additional material. McKeesport also questioned one of two RRC members who had reviewed McKeesport about the reasons for the withdrawal. The appeals panel upheld

the RRC's decision to withdraw accreditation.[0]  In summary the

appeals panel stated that

---

[0]It cited the following reasons:

> 1. [T]here is little independent scholarly activity
> within the Department of Surgery at McKeesport
> Hospital.  The only potential scholarly activity that a
> resident may participate in is by going to another
> institution.  There is no attempt at an ongoing
> clinical research program and there have been no
> articles published in peer-review journals, even though
> there are a few papers that have received awards from
> the local chapter of the American College of Surgeons.
> Each resident allegedly completes a clinical study each
> year.  These reports have not appeared in print.  While
> there is some evidence of resident research projects,
> the four full-time faculty are woefully deficient in
> spite of previous warning[s] in this regard.
>
> 2.  After review of the appropriate documents, the
> Appeals Panel recognizes an ongoing inadequacy in the
> accruing of data, not only as to types of operations
> done, but also who has done those operations.  The
> Program Director depends entirely on the house staff to
> accumulate the data and it is often flawed by the fact
> that there has been inadequate participation on the
> part of the Program Director in the data collecting
> process and therefore there is no check and balance
> system.  The Program Director does not know in some
> instances whether the resident has done the case or
> whether it is on a private patient because it will
> always be reported as a first assistant.  These
> continuing flaws in accruing data and monitoring it
> carefully with a check and balance system by the
> Program Director leaves the Board to sustain the
> citation.
>
> 3.  Continuation of care by residents is poorly
> documented.  There is a lack of careful follow-up by
> the Program Director or his designee to make sure there
> is continuity of care on the part of the house staff
> either in the public clinic or in the private offices.
> The Panel searched the voluminous records of the public
> clinic and could not find consistent attendance by the
> senior residents.  There is no documented teaching
> during these clinic sessions.  It appears that the
> junior residents attend these clinics, but there is no

31

> [t]he surgical leadership at the McKeesport Hospital does not fully understand that the citations here (insufficient data, continuity of care, scholarly activity, and sufficient number of operations) are the very fabric by which we are judged. There seems to be little recognition that this is important in the management of a residency training program, and the Board of Appeals therefore sustains the recommendation of the Residency Review Committee.

The ACGME accepted the decision of the appeals panel and withdrew McKeesport's accreditation.

It appears from the record that the ACGME went by the book in withdrawing McKeesport's accreditation. It followed all the procedures outlined in the Manual and specified the requirements in the Essentials that the hospital had failed to meet. Despite this, the district court concluded that the procedures were inadequate and that the ACGME's decision was "arbitrary and capricious and not supported by substantial evidence."

---

> consistent follow-up on the part of the senior resident.
>
> 4. Deficiencies in operative experience are well documented in the area of vascular, pancreas, endocrine, trauma, pediatric, and head and neck surgery. There is by contrast a great sufficiency of cases as first assistant. Instances that are mentioned above need to be reemphasized because of the poor record keeping; it is impossible to discern whether a resident has done a case on a private patient or not and, also, there is no evidence that the Program Director, follows the cases done by the residents carefully, thereby being able to even out the total experience of the residents. There may be adequate cases documented for one resident, while his counterpart in the same year may have a dearth to none of such cases.

32

B. <u>Procedural Due Process</u>

The appropriate level of procedural safeguards to satisfy due process depends upon a balancing of the factors enumerated in <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976): 1) the private interest at stake, 2) the government's countervailing interest, and 3) the risk of an erroneous deprivation of the private interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards.

Although McKeesport has a protectable property interest in its license to conduct a surgical residency program, the interest is probably not very strong.  Withdrawal of the program's accreditation will affect only one part of the hospital's operations; indeed it will affect only one of many residency training programs the hospital maintains.  Although the hospital may lose some federal funding, the ACGME's withdrawal of accreditation will not force McKeesport to close its doors.  In any event, the hospital may reapply for accreditation if it remedies the deficiencies in its surgical residency program.

By contrast, the ACGME has a significant interest as an accreditation agency in ensuring that the residents in general surgery are adequately trained.  Accreditation of a surgical residency program in effect certifies to society that those who were trained in the program are fit to be surgeons.  Consistent with this interest, the procedures the ACGME currently has in place are quite detailed.  As has been mentioned, the procedures the ACGME employed included 1) notice to McKeesport that its

33

accreditation status was in jeopardy, 2) an initial review of the program which included a site visit, 3) reconsideration of the review in which McKeesport was allowed to present new evidence, and 4) review before a separate appeals panel at which McKeesport was represented by counsel, and was provided an opportunity to present witnesses, question members of the RRC, and present additional evidence.

The district court believed that these accreditation procedures did not satisfy procedural due process because they employed vague standards, gave McKeesport inadequate notice, placed undue emphasis on past violations, and did not allow cross-examination. I do not believe that any of these supposed defects are supported by the evidence or would in any event constitute a denial of McKeesport's due process rights. Curing these asserted defects would do little to decrease the risk of an erroneous withdrawal, and any additional procedures would seem to be of negligible worth when compared to their cost.

First, the district court thought two requirements in the Essentials, the "substantial compliance" and "operative experience" ones, were vague. In contrast to the district court, I believe that the formulation of these requirements preserved the ACGME's ability to exercise its professional judgment in making accreditation decisions. More particularly, the ACGME was entitled to make a conscious choice in favor of flexible standards to accommodate the variations among its member institutions, and to avoid forcing all programs into a rigid mold. See St. Agnes II, 748 F. Supp. at 339; Rockland Inst.,

34

Div. of Amistad Vocational Schools, Inc. v. Association of Indep. Colleges & Schools, 412 F. Supp. 1015, 1018 (C.D. Cal. 1976); Parsons College, 271 F. Supp. at 73. Although the incorporation of professional judgment into a professional standard may prevent program directors from predicting with mathematical precision what will or will not satisfy the standard, it does not make the standard unconstitutionally vague, particularly where, as here, experienced program directors can develop a good sense of how that judgment is commonly exercised.

Second, despite the district court's conclusion to the contrary, the ACGME gave McKeesport adequate notice of its alleged deficiencies. On several occasions, the ACGME sent McKeesport detailed letters of notification stating the areas in which McKeesport needed improvement. After ACGME notified McKeesport of the withdrawal, McKeesport again received a detailed notice of the RRC's evaluation. It was even notified of specific concerns of the RRC and the appeals panel, and was allowed to submit additional information to address those concerns. Such notification procedures were not constitutionally infirm.

Third, the district court's conclusion that it was unfair for the RRC to consider the history of the program when making its decision while the appeals panel would not consider changes in the program following the RRC's decision, reflects an erroneous view of the different functions performed by the RRC and the appeals panel. In the ACGME's accreditation process, the RRC makes the original substantive decision with respect to the

35

accreditation. At that stage, it seems perfectly appropriate to take into account past performance as a predictor of future performance. However, at the appeals stage, which is designed only to ensure that the RRC acted properly, subsequent changes to the program are irrelevant. Thus there is no unfair asymmetry in preventing the program director from presenting evidence of changes in the program following the RRC decision. It is based upon the acceptable policy decision to fix the accreditation decision at a certain point in time so that the ACGME can make a concrete assessment of the program and not face a moving target.

Fourth, the district court's conclusion that the procedures were infirm because McKeesport could not cross-examine and confront the RRC reviewers overstates the constitutional requirement of "adequate notice and an opportunity to be heard by an appropriate tribunal." St. Agnes II, 748 F. Supp. at 337 (internal quotations omitted). The Constitution requires a proceeding appropriate under the circumstances; it does not require confrontation and cross-examination in every proceeding. See also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494 (1985) (stating that a pretermination hearing need not be elaborate and that notice and an opportunity to respond are the critical components).

Cross-examination and confrontation, which are generally procedures aimed at resolving questions of historical fact that may turn on the credibility of the participants, are not absolutely necessary in a procedure related to accreditation decisions like the one here. The ACGME's proceeding is aimed at

36

the application of a standard of quality in a field of medical education.  In this case, as in most cases, the facts were essentially undisputed.  While the effect that such facts might have on the accreditation decision were in dispute, this determination was largely a question of professional judgment, rather than of credibility.  Confrontation and cross examination would have added little to that determination.  Thus the lack of such procedures did not deny McKeesport procedural due process.[0]

In short, none of the reasons cited by the district court supports the conclusion that McKeesport was likely to succeed on the merits of its procedural due process claim.  At bottom, McKeesport's claim that the ACGME's procedures violate constitutional requirements of due process really rests on the proposition that procedures which allow an accrediting body to exercise its professional judgment when reaching its decisions violate constitutional standards of due process.  But insofar as the ACGME's professional judgment is the most important tool it

---

[0]Two of the court's other findings, that an inadequate amount of time was allotted in the RRC hearing for consideration of individual cases and that the ACGME's procedures disregarded the site surveyors' findings, are potentially problematic.  Under the current ACGME review procedures, only two reviewers carefully evaluate the program.  Although their results are then reported to the RRC along with a number of other reviews of programs, the full membership of the RRC relies on their notes and appears to give only perfunctory review to each individual program (50 to 70 programs are reviewed during a single day-and-a-half session). Similarly, the site surveyor, who has in-depth knowledge of the program, cannot make recommendations about accreditation.  The decisions to limit the review by the RRC of individual programs and to limit the role of the site surveyor, however, reflect the ACGME's exercise of its judgment as to the procedures appropriate for the review of programs, something that I would not lightly disturb.

has to ensure the quality of residency programs, that proposition cannot be correct.

## C. Substantive Due Process

The district court's conclusion that the ACGME violated substantive due process in its review of McKeesport is also flawed.  The court's conclusion was based on random entries in site surveyors' reports and comments from the RRC reviewers who reconsidered the adverse action.  In particular, the court pointed to comments by site surveyors to the effect that the ACGME tended "to come down strong" on community hospital programs (McKeesport is a community hospital), and that the ACGME was hostile to programs with large numbers of foreign doctors.[0]  The district court also found that, by the time the appeals panel considered McKeesport's program, every claimed deficiency except for McKeesport's lack of scholarly activity had been remedied or had been deemed insupportable by the evidence.

---

[0]The conclusion that the ACGME is biased against foreign trained doctors is apparently based on an isolated statement in the record from a state observer that the ACGME "sees with a jaundiced eye the inclusion of foreign medical graduates in residency programs."  There is otherwise little or no support for such a finding.  Nevertheless, it is a matter of common knowledge that nearly every hospital in the United States (teaching and non-teaching) has a significant number of such doctors, and yet most teaching hospitals have satisfied the ACGME requirements.  Moreover, the notion that ACGME is biased against community hospitals lacks significant record support.  But whether or not the district court's findings were correct on this issue, the ACGME's findings were otherwise supported by enough evidence that I do not believe that the ACGME ran afoul of substantive due process.

But the existence of some evidence contrary to the ACGME's decision does not mean that the decision was not supported by substantial evidence.  Courts must pay special deference to a professional accreditation organization's substantive decisions in light of the special expertise required to determine professional competency.  See Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc., 432 F.2d 650, 655 (D.C. Cir. (1970), cert. denied, 400 U.S. 965, 91 S. Ct. 367, 27 L. Ed. 2d 384 (1970).  And the record shows that the ACGME very carefully reviewed the program and found substantial support for at least four of the five deficiencies.

Following its review of the McKeesport program in 1989, the RRC expressed "serious concern" in five areas and stated that the next survey would occur in one year.  It is undisputed that during the 1990-91 review the program director submitted incorrect information to the RRC.  It is also not seriously disputed that there was substantial evidence to support the ACGME's finding that McKeesport has a deficient level of scholarly activity: the ACGME repeatedly complained about McKeesport's lack of adequate scholarly activity, particularly its lack of peer-reviewed journal articles, and McKeesport does not seriously contend otherwise.

The ACGME also had substantial evidence to support its finding that there were deficiencies in surgical experience at McKeesport.  Although the Essentials does not set forth a precise number of required operations, the numbers of vascular, pancreas,

39

endocrine, trauma, pediatric, and head and neck operations at McKeesport were known, and the most recent data had shown that the McKeesport program was unable to provide adequate experience in six of the thirteen major categories of surgery. Of the two McKeesport graduates, one was deficient in seven of the defined categories, and the other in four. In the ACGME's professional judgment, McKeesport's program did not have the "breadth, depth, complexity, and volume to sustain an adequate experience for two residents, and that each of these residents did not have what [the ACGME] would accept as a broadly based surgical experience." This conclusion was within the ACGME's competence to decide and was not arbitrary and capricious.

In view of the supported ACGME conclusions about scholarly activity and surgical experience, both of which it considers important criteria for program certification, I am satisfied that McKeesport had no probability of success on the merits of the substantive due process claim.[0]

D.  Common Law Due Process

---

[0]Because I believe that McKeesport has not shown a likelihood of success on the merits, I need but briefly discuss the balance of the harms, but that consideration also militates in favor of setting aside the district court's injunction. To begin with, the balance of harms does not clearly favor McKeesport since the ACGME, and the state, have a strong interest in maintaining the quality of surgeons, and a grant of a preliminary injunction would compromise that interest. Moreover, because the public interest in having qualified surgeons is a strong interest weighing in the ACGME's favor, I believe that McKeesport would have had to make a very strong showing of likelihood of success in order to be entitled to a preliminary injunction, something it clearly did not do.

McKeesport's complaint averred only a violation of constitutional due process. It appears, however, that McKeesport could have also claimed a violation of common law due process (as it now seeks leave to amend to do). Many courts have recognized a state or common law duty on the part of "quasi-public" private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members. See Wilfred Academy of Hair & Beauty Culture v. Southern Ass'n of Colleges & Schools, 957 F.2d 210, 214 (5th Cir. 1992); Medical Inst. of Minn. v. National Ass'n of Trade & Tech. Schools, 817 F.2d 1310, 1313 (8th Cir. 1987); Marlboro Corp. v. Association of Indep. Colleges & Schools, Inc., 556 F.2d 78, 79 (1st Cir. 1977); Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc., 432 F.2d 650, 655 (D.C. Cir. (1970), cert. denied, 400 U.S. 965, 91 S. Ct. 367, 27 L. Ed. 2d 384 (1970); Peoria School of Business, Inc. v. Accrediting Council for Continuing Educ. & Training, 805 F. Supp. 579, 582 (N.D. Ill. 1992); St. Agnes II, 748 F. Supp. at 338; Interfaith Med. Ctr. v. Sabiston, 136 A.D.2d 238, 242-43, 527 N.Y.S.2d 48, 50-51 (App. Div. 1988). Such a common law duty appears to exist under Pennsylvania law. See School Dist. v. Pennsylvania Interscholastic Athletic Ass'n, 309 A.2d 353, 357 (Pa. 1973); Psi Upsilon of Philadelphia v. University of Pa., 591 A.2d 755, 758-59 (Pa. Super.), appeal denied, 598 A.2d 994 (Pa. 1991); Boehm v. University of Pa. School of Veterinary Medicine, 573 A.2d 575, 579 (Pa. Super.), appeal denied, 589 A.2d 687 (Pa. 1990). Importantly, unlike the constitutional due process cause

41

of action, the common law due process cause of action has no state action requirement.  See St. Agnes II, 748 F. Supp. at 337–338.

McKeesport avers that it should be given the opportunity to seek leave to amend its complaint to assert a common law due process claim.  I note, however, that the requirements of common law due process are quite similar to those for constitutional due process, and most courts treat them interchangeably.  See, e.g., Marlboro Corp., 556 F.2d at 79; see also North Jersey Secretarial School, Inc. v. National Ass'n of Trade & Tech. Schools, 597 F. Supp. 477, 479–80 (D.D.C. 1984) (stating that accrediting associations owe its members a duty to provide fair and impartial procedures, to base decisions on substantial evidence, and to avoid arbitrary and capricious actions), vacated without op., 802 F.2d 1483 (D.C. Cir. 1986).  Thus, because I believe that McKeesport cannot make out a claim for violation of constitutional due process, I doubt that it will be able to succeed on a claim for violation of common law due process either, though I acknowledge that the question should be addressed by the district court in the first instance.

## III.  Conclusion

While I believe the ACGME is a state actor, I also believe that it satisfied the requirements of procedural and substantive due process, and consequently, McKeesport had no likelihood of success on the merits.  Because I too would reverse

the order granting the preliminary injunction, I concur in the judgment of the court.